NOEL JOURDAN AND JOSEPH LANDRY, PLAINTIFFS IN ERROR, *v*. THOMAS BARRETT ET AL.

*Under the former government of Louisiana, the regulations of O'Reilly, Gayoso, and Morales recognized the equitable claim of the owners of tracts of land fronting on rivers, &c., to a portion of the public lands which were back of them, and after the cession, the United States did so also.*

*The act of Congress passed on the 3d of March, 1811 (2 Lit. & Brown's ed. 662), extended to the front owner a preference to enter the land behind him. That act also provided, that where, owing to a bend in the river, each claimant could not obtain a tract equal in quantity to the tract already owned by him, the principal deputy surveyor of each district, under the superintendence of the surveyor of the public lands south of the State of Tennessee, should divide the vacant land amongst the claimants in such manner as to him might seem most equitable.*

*The act of March 2d, 1805, had extended the power of the surveyor of lands south of Tennessee over the Territory of Orleans, and the act of April 27th, 1806, had directed him to appoint two principal deputies, one for each district of the Territory of Orleans.*

*The act of March 3d, 1831, directed the appointment of a surveyor-general of public lands in Louisiana, after the 1st of May, 1831.*

*In March, 1832, therefore, the surveyor of public lands south of Tennessee had no power to approve a survey.*

*The act of 1811 reserved for the public all such back lands as were not correctly taken up under that act by the proprietors of river-fronts; and those who did not enter their claims in time did not lose whatever equity they may have had before the passage of the act.*

*An unauthorized survey by one of the claimants did not confer upon him any additional rights.*

*In executing the acts of 1820 and 1832, claimants were allowed to pay for the largest amount which they claimed, but the precise amount due on the exact quantity of land to which they were entitled could not appear until the final survey.*

*When the land was laid out into ranges, townships, &c., the survey of township No. 11, approved by H. S Williams, surveyor-general of Louisiana, settled the rights of parties in that township.*

*A possession of any part of these back lands, anterior to this survey, cannot be set up as a defence under the laws of Louisiana, because the lands belonged to the United States, and those persons in possession were trespassers.*

THIS case was brought up from the Supreme Court of Louisiana for the Eastern District, by a writ of error, issued under the 25th section of the Judiciary Act.

They were petitory actions, according to the practice of Louisiana, brought by the plaintiffs in error against Barrett, to recover some land, and as they involved the same questions of law, they were consolidated in the courts of that State.

By referring to the diagram (which will be found on the next page), it will be seen that Jourdan and Landry were the owners of land fronting on the Mississippi River, and running back about forty arpents. There were nearly forty other proprietors similarly situated, between *a* and *c*, whose location it is not necessary to insert. Their lands were all bounded in the rear by a line running nearly parallel with the river, so as to include the quantity called for in their respective grants.

The facts in the case were these.

On the 3d of March, 1811, Congress passed an act, entitled "An Act providing for the final adjustment of claims to lands, and for the sale of the public lands, in the Territories of Orleans and Louisiana, and to repeal the act passed for the same purpose, and approved February 16, 1811." (2 Lit. & Brown's ed. 662.)

*a b* and *b c* are the township lines.

*d e f g,* land fronting on the river, belonging to Landry.

*h i k l,* land fronting on the river, belonging to Jourdan.

*r e f m n l k s,* the boundary-line of all the original grants, showing how far back they extended from the river.

*m n o p,* the land claimed by Barrett, under Bringier.

By running the lines of Jourdan's and Landry's grants back from the river, it is easy to see how they would respectively clash with Barrett's claim.

The fifth section was as follows : —

5th. " That every person who, either by virtue of a French or Spanish grant recognized by the laws of the United States, or under a claim confirmed by the commissioners appointed for the purpose of ascertaining the rights of persons claiming lands in the Territory of Orleans, owns a tract of land, bordering on any river, creek, bayou, or water-course, in the said territory, and not exceeding in depth forty arpents, French measure, shall be entitled to a preference in becoming the purchaser of any vacant tract of land adjacent to, and back of, his own tract, not exceeding forty arpents, French measure, in depth, nor in quantity of land that which is contained in his own tract, at the same price, and on the same terms and conditions, as are or may be provided by law for the other public lands in the said territory. And the principal deputy surveyor of each district, respectively, shall be, and he is, hereby authorized, under the superintendence of the surveyor of the public lands south of the State of Tennessee, to cause to be surveyed the tracts claimed by virtue of this section ; and in all cases where, by reason of bends in the river, lake, creek, bayou, or water-course bordering on the tract, and of adjacent claims of a similar nature, each claimant cannot obtain a tract equal in quantity to the adjacent tract already owned by him, to divide the vacant land applicable to that object between the several claimants, in such manner as to him may appear most equitable ; Provided, however, that the right of preëmption granted by this section shall not extend so far in depth as to include lands fit for cultivation bordering on another river, creek, bayou, or water-course. And every person entitled to the benefit of this section shall, within three years after the date of this act, deliver, to the register of the proper land-office, a notice in writing, stating the situation and extent of the tract of land he wishes to purchase, and shall also make the payment and payments for the same at the time and times which are or may be prescribed by law for the disposal of the other public lands in the said territory ; the time of his delivering the notice aforesaid being considered as the date of the purchase. And if any such person shall fail to deliver such notice within the said period of three years, or to make such payment or payments at the time above mentioned, his right of preëmption shall cease and become void ; and the land may thereafter be purchased by any other person in the same manner and on the same terms as are or may be provided by law for the sale of other public lands in the said territory."

On the 11th of May, 1820, Congress passed another act (3 Lit. & Brown's ed. 573), entitled, "An Act supplementary to the several acts for the adjustment of land-claims in the State of Louisiana," the seventh section of which was as follows.

" That the fifth section of the act of the 3d day of March,

Jourdan et al. *v.* Barrett et al.

1811, entitled, 'An Act providing for the final adjustment,' &c., &c., be, and the same is, hereby revived and continued for the term of two years from and after the passing of this act."

On the 12th of April, 1822, Bringier, under whom Barrett, the defendant claimed, filed the following application.

To the Register of the Land-office for the Eastern District of Louisiana, at New Orleans.

SIR, — In virtue of an act of Congress, dated 11th May, 1820, I apply to become the purchaser of a tract of land adjacent to and back of a front tract already owned by me, which said front tract contains 27 arpents 13 toises and 2 feet front, and forty arpents in depth, bounded as follows, viz., front on the left bank of the Mississippi, on the upper side by land of Baptiste Loviere, and below by lands of Paul Le Blanc. This land, composed of four tracts, confirmed in the name of Alexis Cesar Bonremy, and in the name of James Melançon. Two arpents, on the lower side, have been sold. The said back land, now claimed by right of preëmption, extends in depth                 arpents, beginning at the rear of the said front tract, and contains five hundred and ten superficial acres, not being a greater quantity than is contained in my front tract, and does not extend so far back as to include any land fit for cultivation, bordering on any river, creek, bayou, or water-course.

(Signed,)         ML. DORADON BRINGIER.
*New Orleans, April 12th,* 1822.

On the 13th of April, 1822, Bringier paid to the receiver $637·50, as the price of the land.

On the 17th of May, 1822, Harper, the register, issued the following certificate.

I certify, that from the records in my office, expressing the quantity of land contained in the applicant's front tract (the surveys in this district not having been executed), and in virtue of the laws in this case made and provided, it appears the said applicant is entitled to the quantity of land for which he has applied, viz., five hundred and ten superficial acres, on paying the price of one dollar and twenty-five cents per acre.

(Signed,)         SAMUEL H. HARPER, *Register.*

On the 17th of December, 1822, John Wilson, subscribing himself principal deputy surveyor for that district, surveyed the tract of land at the request of Bringier, who took possession of it. It is unnecessary to state the mesne conveyances by which the title was passed, through sundry persons, from Bringier to Barrett, who was in possession at the institution of the present suits.

In 1829, the township and sectional lines were run, for the first

time, over this district, in the mode pursued in running out other public lands of the United States.

On the 10th of June, 1830, a survey was completed, under the authority and with the approbation of A. T. Rightor, principal deputy surveyor of the exterior boundaries of the township and of the lands in question, together with others, which survey was re-examined and approved by Gideon Fitz, surveyor of public lands south of Tennessee, on the 9th of March, 1832. This survey differed in some degree from the one previously made by Wilson, although agreeing with it in substance; and being adopted by Bringier and his grantees as the basis of their title, has been followed in the preceding diagram.

On the 15th of June, 1832, Congress passed another act (4 Lit. & Brown's ed. 539), entitled, "An Act to authorize the inhabitants of the State of Louisiana to enter the back lands." It did not refer to either of the two preceding acts, but in substance, and nearly in the same words, reënacted the fifth section of the act of 1811, limiting the time of making application to three years from the date of the act.

On the 9th of August, 1834, Jourdan, one of the plaintiffs in error, obtained from the receiver the following certificate.

RECEIVER'S OFFICE, So. EAST. DIST. LA.
*New Orleans, August 9th,* 1834.

Received from Noel Jourdan, of the parish of St. James, the sum of three hundred and thirty-six $\frac{80}{100}$ dollars, being in full of the purchase money of his preëmption right by virtue of an act of Congress authorizing the inhabitants of Louisiana to enter their back lands, approved 15th June, 1832, to a tract of land adjacent to and ack of his front tract, situate in township No. 11, range No. 3 east, and containing two hundred and sixty-nine $\frac{44}{100}$ superficial acres, at one dollar and twenty-five cents, as per register's certificate, numbered No. 9.

(Signed,)          MAURICE CANNON,
*Receiver of Public Moneys.*

On the 8th of March, 1836, Landry, the other plaintiff in error, obtained the following certificate.

No. 520.   RECEIVER'S OFFICE, So. EAST. DIST. LA.
*New Orleans, 8th March,* 1836.

Received from Joseph Landry, of the parish of St. James, the sum of one hundred and ninety-two $\frac{76}{100}$ dollars, being in full of the purchase money of his preëmption rights, by virtue of an act of Congress, authorizing the inhabitants of Louisiana to enter their back lands, approved 15th June, 1832, to a tract of land adjacent to and back of his front tract, situate in township No. 11, range

o *

No. 3 east; and containing one hundred and fifty-four $\frac{21}{100}$ superficial acres, at one dollar and twenty-five cents, as per register's certificate, numbered 520, and being described as section No. 19.

    (Signed,)                MAURICE CANNON,
                               *Receiver of Public Moneys.*

In February, 1838, Jourdan and Landry filed separate petitions in the District Court for the First Judicial District of the State of Louisiana, claiming their respective back lands.   Barrett, who was then in possession of the tract surveyed for Bringier, answered the petition and called in warranty, according to the Louisiana practice, all the intermediate grantors between Bringier and himself and Bringier also.   They all responded to the call, and various evidence was taken and filed in the causes, which, as has been already mentioned, were consolidated and prosecuted together.

On the 22d of March, 1838, the court adjudged and decreed that judgment should be entered for Barrett, the defendant ; an appeal being made to the Supreme Court of Louisiana, that court, on the 21st of January, 1839, affirmed the judgment, to review which a writ of error brought the case up to this court.

The case was argued by *Mr. Coxe,* for the plaintiffs in error, and *Mr. Crittenden,* for the defendant.

*Mr. Coxe* referred to the act of 3 March, 1811, chap. 46, 2 Lit. & Brown's ed. 662 ; 1 Land Laws, 196 ; the act of 11 May, 1820, chap. 87, 3 Lit. & Brown's ed. 573 ; Land Laws, 331 ; the act of 15 June, 1832 ; Land Laws, 499 ; and the act of February 24, 1835, and contended that the title claimed by the plaintiffs was not so far forfeited by nonclaim, under the first two statutes, as to become incapable of confirmation under the subsequent legislation of Congress.

*Mr. Crittenden,* for defendant in error.

This is a suit for land in the State of Louisiana.   The controversy arises out of interfering claims, which originate in the acts of Congress granting to the proprietors of lands fronting on the Mississippi River, &c., a right of preëmption of the lands lying back of and adjoining their original or front tracts, and not exceeding the quantity thereof.

The acts of Congress, so far as they affect this case, are three in number ; namely, an act of the 3d of March, 1811, 2 Lit. & Brown's ed. 662 ; an act of the 11th of May, 1820, 3 Lit. & Brown's ed. 573 ; and an act of the 15th of June, 1832, 4 Lit. & Brown's ed. 534.

The 5th section of the act of 1811, having expired by its own limitation of three years, was revived and continued in force for

two years by the act of the 11th of May, 1820.   M. D. Bringier, being of that class of proprietors embraced by the above acts, and owning land bordering on the Mississippi River, and not exceeding in depth forty arpents, French measure, was entitled to the right of preëmption granted thereby ; and, intending to avail himself of the preference and privilege given to him, he did, on the 12th day of April, 1822, and within the two years allowed by the said act of 1820, deliver to the register of the proper land-office a notice, in writing, of the situation and extent of the land he wished to purchase, and did make payment for the same, as required by law, and did thereby become the purchaser of the land, namely, 510 acres.

The land so purchased by Bringier was surveyed for him on the 17th of December, 1822, by John Wilson, principal deputy surveyor for that district.   Afterwards, on the 10th of June, 1830, M. F. Rightor, then principal deputy surveyor for Louisiana, undertook to make, and did make, another survey of Bringier's claim, variant but little from the survey of Wilson.   This survey of Rightor's was approved by the surveyor-general of the public lands south of Tennessee, on the 9th of March, 1832.   And to this later survey, Bringier and those claiming under him have submitted, and limited his claim and possession, and the land in contest lies within its boundaries.   Bringier took possession of the land at the period of his purchase, and the possession has ever since been continued in him and those claiming under him.   Bringier sold and conveyed his plantation, called Whitehall, including the land aforesaid, to the late General Wade Hampton, on the 9th of February, 1825 ; who, on the 6th of April, 1829, sold and conveyed the same to Leroy Pope, who, on the 18th of March, 1833, sold and conveyed the same to the defendant, Thomas Barrett.   At the time of Bringier's purchase aforesaid, no survey had been made of the land, nor was any general survey made of the public lands in that district till long after.        o

Barrett was thus entitled and in possession under Bringier, and the act of 1820, under which his claim was derived, had long since expired, when the Congress passed the said act of the 15th of June, 1832, reënacting, in substance, the 5th section of the act of 1811, and extended its operation as well to all purchasers from the United States as to French and Spanish claimants, to whom all the previous acts had been confined.   Under this act of 1832, Noel Jourdan and Joseph Landry, claiming severally and respectively, under French or Spanish claims confirmed by the United States, lands bordering and fronting on the Mississippi River, and lying contiguous to the aforesaid claim of Bringier, asserted their right of preëmption to the lands back of their original tracts, and purchased, Noel Jourdan 269·44 acres, on the 9th of August, 1834, and Joseph Landry 154·21 acres, on the 8th of March, 1836.

In his general survey and township map of the litigated and circumjacent lands, made in 1834, Mr. Williams, the surveyor-general for Louisiana, has undertaken to survey and apportion out to the plaintiffs and defendant, respectively, who are all contiguous and front proprietors, the lands lying back of them ; and this he does by a prolongation of the side lines of each front tract to the depth of forty arpents from the back line of the front tracts.

These side lines are all perpendicular to the river, and converge as they recede from it, owing perhaps to their being situated within a bend.

This mode of surveying and settling the claims of these preemptioners, by a prolongation of the side lines of their original tracts, was adopted and acted upon by the surveyor (Williams) in his survey of 1834, and seems to have been approved of by the surveying department. The effect of it is, that the claim of Bringier (now held by Barrett) is curtailed, and the subsequent claims of Landry and Jourdan are made to interfere, the former to the extent of 31 acres, the latter of 33 acres, with the prior claim and survey of Bringier.

For these interferences, Landry and Jourdan respectively brought suit against Barret, in the District Court for the First Judicial District of Louisiana. Pope, the heirs of Hampton, and Bringier, were, in the progress of the suit, cited in warranty, and made defendants.

By consent of parties, the suits of Jourdan *v.* Barrett and Landry *v.* Barrett were consolidated, and were tried and decided together.

The above statement contains the material and leading facts on which the rights of the parties depend.

Upon the trial in the District Court, judgment was rendered in favor of Barrett ; and, upon appeal by the plaintiffs to the Supreme Court of Louisiana, that judgment was affirmed. And the plaintiffs now prosecute their writ of error in the Supreme Court of the United States.

The reasoning of the District and Supreme Courts of Louisiana, on which their judgment was founded, appears to me to be entirely satisfactory and unanswerable.

If the conflicting claims of the parties litigant had been contemporaneous, and connected by having a common origin from the same act of Congress, such an apportionment as that made by the last survey (the survey of Williams), and now insisted on by the plaintiffs, might have been proper. But such a rule can have no application to a case like the present. Bringier had made a legal appropriation of the land under the act of 1820. From the expiration of that act, which gave the right of preëmption for two years only, until the passage of the act of the 15th of June, 1832, there was no right or title of any description conflicting with that

of Bringier. It was not the intention or within the competency of Congress to impair, diminish, or take away, by this latter act, the previously acquired or vested rights of Bringier.

The land appropriated by him under the act of 1820 was not "vacant" at the passage of the act of 1832; and this latter act gives no more than the preëmptive right to lands "vacant" at the time of its passage.

It is therefore insisted, on the part of Barrett, that the judgment ought to be affirmed.

Mr. Justice CATRON delivered the opinion of the court.

The record brings before us two petitory actions; one of Landry against Barrett; and the other of Jourdan against the same defendant. The State District Court of Louisiana adjudged the title of Barrett the better, and for this reason decided in his favor in both actions; but in that of Landry it was also held, that the title to the land he claimed was invalid, because he produced no other evidence of claim than the receipt of the receiver above set forth, dated 8th March, 1836; that the act of June 15, 1832, limited his right to purchase to three years; and not having filed his notice of claim, and paid his money, until the 8th of March, 1836, he came too late, and for this reason, also, the petition must be dismissed. The judgment being affirmed generally by the Supreme Court of Louisiana, and being opposed to the authority exercised by the officers of the United States, acting in virtue of acts of Congress, it becomes our duty to examine whether the judgment below was proper on this ground. We find the District Court overlooked the act of February 24, 1835, which extended the time to the 15th of June, 1836, to owners of front tracts to become purchasers by preference of the back tracts adjacent to those owned by them; so that the purchase made by Landry on the 8th of March, 1836, was in time. It follows, the claims of Landry and Jourdan are alike; and the opposing claim of Barrett, being the same as to each of the petitioners, the controversy may be treated as one suit. It depends on mixed questions of law and fact; both having been submitted to the courts below for their judgment, without the aid of a jury; and as the facts giving rise to the controversy call for construction of acts of Congress to give the facts effect, they come before this court for its action under the 25th section of the Judiciary Act. This is the settled doctrine here, as will be seen by the cases of Pollard's heirs *v.* Kibbie (14 Peters, 353), The City of Mobile *v.* Eslava (16 Peters, 234), and Chouteau *v.* Eckhart (2 How. 372).

Neither party has a patent; and each comes before us asserting a superior equity to the lands in dispute. Barrett insists that the entry under which he claims title, dated April 12, 1822, was made for a specific quantity of 510 superficial acres, and designated by

survey and side lines ten years and more before the opposing claims originated, and therefore his possession cannot be disturbed by their assertion.

On the other hand, it is insisted that Bringier, under whom Barrett claims title, had no preference extended to him by the act of May 11, 1820, to enter so much as 510 acres as back land to the Whitehall tract ; that it fronted on the inside of a bend of the Mississippi River, and conformed to Spanish and French forty arpent concessions made on fronts, in concave bends, in the extension of side lines ; which uniformly converged in proportion to the greater or less circle of the bend ; that the Whitehall tract was much narrower on the back than on the front side ; that the act of Congress did not permit Bringier to enter any other back land than that within his direct side lines, produced from the river eighty arpents deep ; and that Barrett's equity is limited to the "back land," in quantity to forty arpents deep within these lines, although much less than 510 acres.   And that, as this mode of surveying the double concession will not include the land entered by either of the petitioners, they are entitled to recover ; furthermore, that in this form has Barrett's claim been surveyed by public authority, and in no other.

In December, 1832, Bringier caused Wilson, a surveyor, to run out his claim of 510 acres, in the same form of the front tract ; that is, he began at the back terminus of each side line of the old tract, and ran diverging lines so as to make the opposite side of his new survey of the same width with the front on the river, thus making a tract of 1,020 acres, little more than half as wide in the middle as it is at either end.   This survey was neither returned to, nor recorded in, the surveyor-general's office ; nor recognized by the officers of the United States as a public survey.   Bringier, and those claiming under him, however, took and held possession of the land surveyed, and improved the same, assuming that it covered the land entered in 1832, and that it was lawfully made ; at least, as against any claim the petitioners can be permitted to set up.   This we suppose mainly to depend on the true construction of the act of 1811, which was renewed from time to time.

The surveys of township No. 11, including the lands in dispute, were not made until the fall of 1829 and spring of 1830, and then only in part, both as to the ordinary extension lines, and as regarded the private grants and back lands subject to be attached by preference of entry to front grants.   Until these latter were surveyed, they could not be acted on as to specific quantity. By the act of March 2, 1805, section 7, the powers of the surveyor of lands south of Tennessee were extended over the Territory of Orleans.   And by the 9th section of the act of April 21, 1806, he was directed to appoint two principal deputies, one

for each of the districts into which the Orleans Territory was divided ; who were to keep separate offices of their own, and to execute public surveys in their respective districts, in conformity to the regulations and instructions of their principal.

By the act of March 3, 1831, a surveyor-general of public lands lying in the State of Louisiana was ordered to be appointed ; and on whom, within the State, were devolved the duties formerly imposed on the surveyor of lands south of Tennessee ; that is, after the 1st of May, 1831 ; and also the duties of the two principal deputies authorized by the act of 1806. The latter offices were abolished, and the duties appertaining to them merged in the surveyor-general's office of Louisiana. That officer took charge of the official records and papers ; and on him was imposed the duty of doing equity among those entitled to back concessions under the acts of 1820 and 1832, where it had not been previously done. His own deputies did the field work not done on his coming into office ; and in his time were the surveys in township No. 11 completed ; and by him were they first approved after their completion. This the government recognizes as the *legal survey* of the township, by which the United States are bound, and on extracts from which patents and certificates can be founded ; and to this end the approved plan of it was filed in the register's office of the Southeastern District of Louisiana, on the 8th of August, 1834 ; by it all those purchasing from the United States, either by preference of entry, or otherwise, are bound to abide, unless legal alterations have been made, or there were existing legal and sanctioned surveys, laying off back lands to particular front owners, independent of the general survey. None such was made for the Whitehall tract, as we think, and its back land, as to extent and form, is governed by the general plan above named. The one made by Rightor's direction, approved by Gideon Fitz, surveyor of public lands south of Tennessee (March 9, 1832), received no additional value from such approval, as the act of 1831 superseded his authority in this respect. Rightor deposes, that at no time had the surveyor south of Tennessee any power of approval or supervision of the surveys made by him, Rightor, as principal deputy ; and that the surveys made by Foster and Walker in the spring of 1830, and approved by Rightor, as principal deputy, June 10, 1830, in his judgment bound the United States, as to the form and extent of the land attached to the Whitehall tract. The commissioner of the general land-office thought the survey on its face an unwarrantable proceeding, as it cut off the back lands of Bringier's neighbours, and violated the act of 1811. 2 Land Laws, No. 950. And we think the commissioner was right in his conclusion. Claims of double concessions in Louisiana were not new in practice ; surveys of such claims were common, and the direct extension of the side lines of the front tract was the

equity, as a general rule, accorded to them, as we apprehend ; and so gross a violation of it as is found in Bringier's survey could not be sanctioned.

In April, 1822, when Bringier's entry was made, there can be no fair pretence to say he acquired by the entry an equity to the extent of Wilson's or Rightor's survey, as against others having at that time equal rights to enter back land, which rights the survey assumed to defeat.    By his entry Bringier acquired an equity to certain land, to be laid off in a form not to interfere with his neighbours having equal rights under the law.    They did not enter, probably because his unjust, pretended claim deterred them ; and failing to do so until the time expired, Bringier assumed that his equity might be enlarged, and was enlarged, to the extent that Rightor's or Wilson's survey goes.

We think this assumption cannot be sustained ; what equity Bringier acquired took date with his entry, and his survey ought to have been the same, had no one claiming front lands interfered, as the act of Congress reserved for future sale all the back lands not entered in time ; a provision that would have been altogether defeated in this instance, if the assumption was true.    For nearly twenty years after the act of 1811 was passed, the government failed to survey the back lands, so as to afford an opportunity to front owners to acquire woodland in the rear (most necessary in a sugar-growing country), and it would be strange had the power to make back concessions been parted with, in so plain a case, by permitting sweeping surveys like that of Bringier.

We say above, claims for double concessions were not new. O'Reilly's regulations of 1770 provide for narrow front grants on rivers, by forty arpens in depth ; for embankments in front for the exclusion of high water ; for ditches to carry off the water ; for roads and bridges.    The 17th article of Gayoso's regulations confirms those of O'Reilly.    These were made by governors-general, who had the distribution of lands from 1770 to October, 1798 ; then the authority was restored to the General Intendant of Louisiana and West Florida, Morales : and in this officer the power remained up to the change of governments, in 1804.    All the regulations will be found in 2 White's Recopilacion, 228, 244.    In article 3d of Morales's, especial duties are prescribed to the owners of front grants, but nearly the same of O'Reilly's.    The syndics were bound to enforce the making of such embankments, ditches, roads, and bridges, and the clearing in the three first years, in addition, a certain quantity of land, and putting it into cultivation.    The grants were not to exceed six or eight arpens in front ; usually not so much was granted ; and the lands were to adjoin.    Annually the Mississippi overflows, and to prevent an inundation of the country, heavy and expensive embankments are required, and they must be continuous ; and are so, for hundreds of miles, on the banks

Jourdan et al. v. Barrett et al.

of the river. The country would be worthless without them. It had been reclaimed from the water by this means and the ditches, by the French and Spanish front proprietors ; and on the keeping up of the levees the value of the back lands depended ; the great expense, and constant watchings, during a part of the year, to guard against inundation, and that of the whole country, by a break in the levee at any one place, involve public considerations to Louisiana of the highest magnitude ; and those whose duty and interest it was to prevent it — the front owners — had extended to them, by the Spanish government, peculiar privileges, and which the United States at an early day recognized.

A board of commissioners was established by the act of March 2, 1805, whose duty it was to examine and report to Congress on French and Spanish claims to lands in that section of country ; and by the supplementary act of April 21, 1806, section 5, it was made their further duty, among other things, " to inquire into the nature and extent of claims which may arise from a right to a double or additional concession on the back of grants or concessions heretofore made," " and to make a special report thereon to the Secretary of the Treasury, which report shall be by him laid before Congress at their next session. And the lands which may be embraced in such report shall not be otherwise disposed of until a decision of Congress shall have been had thereupon."

The commissioners were engaged for some six years in the Orleans Territory in pursuing their investigations, and their reports were laid before Congress by the Secretary of the Treasury early in 1812. But in the mean time it was well known what course had been pursued by the board in regard to all descriptions of claims, and among others of back concessions. Instances in the report will be found in 2 Am. State Papers, 297, 337. Of claim (p. 297) No. 101, the board says, — " Benj. Babin claims a second depth of forty arpents, lying immediately back of a front or first depth, which we have already confirmed to him among the confirmed claims."

" The claimant has no other foundation for his title to the second depth than having occupied the front and first depth, and having occasionally supplied himself with timber from this second depth."

" According to the laws, customs, and usages of the Spanish government, no front proprietor, by any act of his own, could acquire a right to lands further back than the ordinary depth of forty arpents ; and although the Spanish government has invariably refused to grant the second depth to any other than the front proprietor, yet nothing short of a grant or warrant of survey from the governor could confer a title or right to the land ; wherefore we reject the claim." We give this as an instance of many similar ones reported.

The statement applies to all front tracts, where only the first

forty arpents had been granted by France or. Spain. Instead of granting the back lands as a donation, the government of the United States extended to the front owner a preference of entry, by the act of 1811 ; and if the entry was not made, the land was reserved, as above stated. No question affecting the titles to lands in Louisiana was more interesting to the old inhabitants, than the one concerning the back lands ; and, although the former government had granted them in probably but few instances, yet this was quite immaterial to front owners at that time, as they had the privilege of getting wood and timber from them, and the lands were in no danger of being granted to another. That back lands at all times meant those in the rear between the extended front lines in the rear, to the distance of forty arpents (each line being a straight one throughout), we suppose to be undoubted, as a general rule, although there may have been exceptions to it.

Many tracts had no doubt been surveyed for the purpose of having them acted on by boards of commissioners ; but the record does not show that any of the front tracts in township No. 11 had been surveyed by public authority ; which could only be done, after the passing of the act of February 28, 1800, under the superintendence of the surveyor-general, — and all other surveys were, by the third section of that act, declared to be private surveys, on which no patent could issue for an incomplete claim, after it was confirmed by Congress. And this law applied equally to confirmations by the commissioners, under the act of March 3, 1807, whose adjudications were final, and authorized a patent to issue thereon.

When the first two acts of 1811 and 1820 were passed, it was known that no township surveys had been made in much the greater portion of the country to which the acts applied ; in reference to this state of the country Congress legislated, and therefore it was provided by the fifth section of the act of 1811, that the principal deputy surveyor of each district should be, and was, authorized, " under the superintendence of the surveyor of the public lands south of the State of Tennessee," to cause to be surveyed the tracts claimed by virtue of that section, that is, preference rights ; and in all cases where there were bends in rivers (as in the case before us), on which the granted tract bordered, and there were adjacent claims of a similar nature, and each claimant could not obtain a tract of equal quantity with the original front tract, then it should be the duty of the surveyor to divide the vacant land between the several claimants, in such manner as to him might appear most equitable.

Three years were allowed from the date of the act for those entitled to give notice in writing, stating the situation and extent of the tract each wished to purchase ; and for which he was to make payment according to the then credit system. But if he failed in either, the right to preëmption should cease and become void ; and

the land might be purchased thereafter by any person, as other public lands. As no public surveys existed, from which it could be ascertained at the register's offices what, the back lands of the numerous tracts were ; and as entries were contemplated in advance of the public township surveys, some mode of ascertaining the quantity and form each front owner was entitled to was indispensable. And the mode adopted by Congress was to make the principal deputy-surveyor of the particular district the judge of form and quantity ; subject, however, to the superintendence of his principal, the surveyor-in-chief of the lands south of Tennessee.

This officer (as well as the principal deputy) was, by the acts of 1812 (April 25th) and 1836 (July 4), subject to the direct control, and bound by the instructions, of the commissioner of the general land-office ; and so was the commissioner subject to the control of the President, through the Secretary of the Treasury, as will be seen by the opinion of the Attorney-general of July 4, 1836 (2 Public Lands, Laws, Opinions, &c., 103). So that, in the end, it devolved on the President, by aid of the Secretary, as in other instances, to see the acts of Congress above set forth duly executed ; and this was done through the commissioner of the general land-office.

On the 18th of March, 1833 (2 Land Laws, 573, No. 516), the commissioner, by an instruction to the registers and receivers of Louisiana, gave a construction to the act of June 15th, 1832 : — 1. That where the back lands had been offered for sale and sold, after the passing of the act, still the front owner was to be permitted to enter them. 2. Where the back tracts had not been surveyed and connected with the adjoining public lands, and the quantity could not be ascertained at the time of payment, the party claiming should be required to pay for the *maximum quantity* to which he could be entitled under the law ; and any excess of payment found on actual survey should thereafter be refunded to the party, on instructions to that effect, to be given from the general land-office.

The form of the receiver's receipt for the payment is there given ; showing the land had not yet been surveyed. And the register was instructed not to transmit the certificate of purchase until the survey was completed, whereby the quantity would be ascertained. The commissioner also informed the registers and receivers that the surveyor-general had been directed to advise them as to the course to be pursued by the claimants in cases where the back tracts remained to be surveyed.

In executing the act of 1832, the foregoing instructions were of course pursued, and entries received on such notices of claim as parties saw proper to file, subject to the risk of being curtailed by the proper public surveys, approved by the surveyor-general. And Mr. Harper proves that on these terms notices of claim were received, under the act of 1820, in 1822, when Bringier's claim was

entered. Harper was then the register at New Orleans. It is manifest that in no, other way could the acts of 1820 or 1832 be executed, than by general surveys of the back lands, whereby the portion of each claimant was marked out. Nor could any survey in township No. 11 be recognized by the register after the appointment of the surveyor-general of Louisiana, and the extinguishment of the offices of the principal deputies (May 1st, 1831), other than such as were approved by the surveyor-general. None was made of Bringier's claim, so far as we are informed, before that time, which received the sanction of any department of the general land-office, and on which a patent certificate and patent could issue. Of Rightor's survey, we have already spoken. Wilson's was a mere private act, at the instance of Bringier, and not recorded anywhere. The instruction of July 25th, 1838 (2 Land Laws, No. 1009), applies to Bringier's case as well as others ; the register and receiver are there directed to issue the certificate of purchase in cases where an over-payment has been made for back lands, by "describing each tract by section, township, range, and area, *as returned by the surveyor-general,*" — assuming the plan approved by him to have settled the equities of parties claiming under the pre-emption laws, as to extent and boundary. And our opinion is, that the survey of township No. 11, approved by H. S. Williams, surveyor-general of Louisiana, on the 5th of August, 1834, was made in execution of the acts of Congress, and governs the rights of the parties before this court ; that to the land there designated as "back land " of the Whitehall tract, Bringier's equity attached, by his notice of claim and the payment of his money, in 1822, and to none other. And that, by the same survey, the equities of Landry and Jourdan, acquired by their entries, are established as the better title to the extent of "back land " attached to their respective tracts by the survey. And to that extent they are respectively entitled to recover, as against the claim of the defendant, set forth in the answers.

Some stress, in the argument, was laid on the fact, that possession had been held of the land in dispute, under Bringier's claim, for more than ten years before the suits of Landry and Jourdan were brought, and therefore the petitioners were barred by prescription and limitation in Louisiana. Prescription of ten years' possession is relied on in defence by a direct plea, and made up part of the defence.

To this ground of defence, it is a sufficient answer to say, that Jourdan first acquired his interest in 1834, and Landry his, in 1836 ; up to that time the lands they claim belonged to the United States, as part of the public domain, and on which the defendant, Barrett, and those under whom he claims, were trespassers ; and that no trespass of the kind can give title to the trespasser, as against the United States, or bar the right of recovery ; nor had

the operation of time any effect as against Landry and Jourdan, until they respectively purchased.

By the Constitution, Congress is given " power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States " ; for the disposal of the public lands, therefore, in the new States, where such lands lie, Congress may provide by law ; and having the constitutional power to pass the law, it is supreme ; so Congress may prohibit and punish trespassers on the public lands. Having the power of disposal and of protection, Congress alone can deal with the title, and no State law, whether of limitations or otherwise, can defeat such title.

For the foregoing reasons, we order the judgment of the Supreme Court of Louisiana to be reversed, and that the cause be remanded, &c.