UNITED STATES v. SHANNON.

(Circuit Court, D. Montana. March 18, 1907.)

No. 725.

1. PUBLIC LANDS—FOREST RESERVES—REGULATIONS.

Article 4, § 3, of the federal Constitution, which provides that "Congress shall have the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States," conferred ample authority on Congress to enact the legislation authorizing the establishing of forest reserves on the public lands and the making of rules and regulations by the Secretary of the Interior "to insure the objects of such reservations" and the rules and regulations so made as contained in the compilation of October 3, 1903, relating to the grazing of stock on such reserves are within the authority so conferred, and reasonable and valid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 135.]

2. SAME—VALIDITY OF REGULATIONS—STATE POLICY OR LAWS.

The United States government has always maintained its right to the exclusive possession of the public lands, although such right has not always been exercised, and the policy of a state to permit live stock to run at large and graze on all open lands, or its laws enacted to carry such policy into effect, cannot affect the right of the general government to re-

quire stockowners to restrain their stock from grazing on the national forest reserves except under prescribed regulations.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 23.]

3. SAME.

Ordinance No. 1, Const. Mont., providing that "the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof," which was adopted pursuant to the requirement of the enabling act, under which the state was organized, was a clear recognition of the exclusive authority of the general government over the public lands within the state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 41, Public Lands, § 7.]

Carl Rasch, U. S. Atty.

Edward Horsky and Ransom Cooper, for defendant.

HUNT, District Judge. The United States brought this action against the defendant, Thomas Shannon, to enjoin him from driving and conducting, or causing, or permitting to be driven or conducted, cattle belonging to him to or upon the Little Belt Mountain Forest Reserve within Montana, and from permitting or allowing his cattle to go upon or remain upon the said reserve. Temporary injunction was issued, as prayed for by the complainant.

The bill alleges that the Little Belt Mountain Forest Reserve was created by proclamation of the President, on August 16, 1902, and that during December, 1904, and prior thereto, the defendant wrongfully and unlawfully, and without right or authority, and without having obtained a permit from the Secretary of the Interior, or the Commissioner of the General Land Office, and in violation of law, and in disregard of the rules and regulations of the Secretary of the Interior, did drive and conduct, and cause to be driven and conducted, upon the said reserve 300 head of cattle, and has permitted the cattle to remain upon the reserve for the purpose of grazing and feeding, to the permanent and irreparable damage and injury of the said reserve, and destructive of the objects for which the reserve was created. The defendant denied the material allegations of the bill, with respect to permitting his cattle to go upon the reserve and to remain thereon. Testimony was taken before a referee. Defendant appeared, but offered no evidence.

It appears that Shannon, the defendant, raises cattle and owns a tract of 320 acres of land, 160 acres of which he acquired under the homestead law, and which lie next to the forest reserve. The rest of his land he acquired under the desert land act. It lies within the limits of the reserve. Shannon's home ranch is from six to ten miles northeast of the area particularly involved in this case, which is that part of the reserve known as "Lone Tree Park." The grazing privileges of the reserve are divided into four districts; Lone Tree Park being a district including a basin on the edge of the mountains. When Shannon bought part of his land there was a fence upon it, which was afterwards opened, or permitted to become open, by Shannon, so that Shannon's stock had free access to the reserve. He has not kept the fence up; his contention being that he is not obliged to. Shannon

has no permit from the Interior Department permitting him to graze his cattle upon the reserve, and it clearly appears that he knew that his cattle were upon the reserve, and that he made no effort to remove them therefrom; his custom having been to turn his cattle upon his own land, and from there they went to the reserve. The Secretary of the Interior limited the number of cattle and sheep which could graze upon the reserve in 1904, 1905, and 1906. It sufficiently appears that damage to the water supply is done by the grazing of more cattle in Lone Tree Park than the number authorized by the Secretary of the Interior, and that the young growth of willows and underbrush is seriously injured by the tramping of cattle.

In considering the several features of this case, it must be conceded that defendant's counsel is correct in his argument that the general policy of the state of Montana, voiced through its laws, is that owners of stock are permitted to have their cattle at large, and that they may feed upon the open public domain, and that an owner of lands not fenced is without remedy for the loss of grasses which may be eaten by animals so ranging; and, furthermore, that generally an owner of lands in Montana must fence out cattle, if he would prevent their going upon lands which are his. But, notwithstanding these things, the question is, was it intended, and can it be, that this state policy obtains with sufficient force to curtail the power of the United States to forbid entry upon its forest reserves by cattle owned by a stockgrower of the state? The question is thus broadly put, because the facts justify a consideration of the case from the standpoint outlined, and because it is desirable that a ruling should be had defining the legal position of the general government and the stockowner whose cattle may drift inside a forest reservation. The substance of the argument of the learned counsel for the defendant is that Congress must have recognized the policy of the law of the state already referred to, and that therefore it should be deemed to have acted in all that it has done in the matter of forest reserves with the public policy of the state in view; hence, that no construction of the acts of Congress, empowering the Secretary of the Interior to make rules and regulations insuring the objects for which forest reservations are created, can be accurate if the effect is to require an owner of cattle to keep his animals off the reserve.

Let us remember that we are not now dealing with a question of a regulation by the Secretary of the Interior, which makes a violation thereof a crime. Were such the point of inquiry, principles not necessarily here applicable would have to be discussed. United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; United States v. Mathews (D. C.) 146 Fed. 306. We can therefore eliminate any question of the liberty of the citizen, and proceed to inquire into the matter of the policy of the state concerning cattle growers, to ascertain the force of that policy in the present instance. Long before the state was admitted, the policy of the United States was to preserve and exercise exclusive right of full dominion over the public lands belonging to it. True, in many cases the United States never interfered at all with use and occupancy of its unoccupied lands by individuals within the several states; for example, it did not seek to prevent

animals running at large upon the public domain within Montana and other western states where stockgrowing is a principal industry. Until the last few years of its existence as a territory, Montana was very sparsely settled. Agriculture was limited. There was but slight demand for public lands, and comparatively none for the foothills of the mountains, and for the grazing lands upon the great benches above the valleys. Stockgrowers could put their cattle or horses or sheep wheresoever they pleased upon such lands without apprehension that their ranges would ever be sought by homestead settlers desiring to enter the lands, cultivate them, and turn them into profitable farms, or that, in time to come, forest preservation would become a fixed national policy. Accordingly, under such conditions, the general government, not only took no action to exclude stockgrowers from using its lands, but rather lent such encouragement to the industry as naturally followed the privilege of unlimited open range. Nevertheless, the general government has been consistent in its attitude of a proprietorship, which has enabled it, not only to maintain its possession, but to maintain its possession exclusively if it pleased to do so, and to prosecute those who have trespassed upon the public lands if it has seen fit. That it has not always exercised the right of exclusive possession by action to prevent trespass or use is one thing; but that the right has always existed is another, and a wholly different matter. The exercise of the right may have been a mere question of policy that has been pursued or not as circumstances may have justified; but the right is in the nature of a trust in the general government for the people of the United States, never subordinate, but parmount to the policy or law of a state which would seek to curtail the full enjoyment of such right. The public lands belong to the United States, and no trespass of the kind involved herein, even though countenanced for years by the government, can imply authority in the trespasser as against the United States, or bar its right at any time to forbid a continuance of such trespass.

Article 4, § 3, of the Constitution provides:

"That Congress shall have the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

This constitutional power is supreme; and the disposal of public lands in the state by act of Congress can in no way be limited by state statute. In Jourdan v. Barrett, 4 How. 169, 11 L. Ed. 924, the power of disposal of the public lands was spoken of in these words:

"By the Constitution, Congress is given 'power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States'; for the disposal of the public lands, therefore, in the new states, where such lands lie, Congress may provide by law, and, having the constitutional power to pass the law, it is supreme; so Congress may prohibit and punish trespassers on the public lands. Having the power of disposal and of protection, Congress alone can deal with the title, and no state law, whether of limitations or otherwise, can defeat such title."

And later, in Gibson v. Chouteau, 13 Wall. 92, 20 L. Ed. 534, Justice Field, for the court, said:

"With respect to the public domain, the Constitution vests in Congress the power of disposition and of making all needful rules and regulations. That

power is subject to no limitations. Congress has the absolute right to prescribe the times, the conditions, and the mode of transferring this property, or any part of it, and to designate the persons to whom the transfer shall be made. No state legislation can interfere with this right or embarrass its exercise; and to prevent the possibility of any attempted interference with it, a provision has been usually inserted in the compacts by which new states have been admitted into the Union, that such interference with the primary disposal of the soil of the United States shall never be made."

With full knowledge of this ownership ·and right of control of public lands, the state of Montana entered the Union. To give special emphasis, however, to the right of the general government as against possible claims of the state in the control over public lands, Congress, in accord with action had when Missouri and other states were admitted, expressly required as a condition to be accepted before admission into the Union, that the constitutional convention for the proposed state of Montana should provide by an ordinance, "irrevocable without the consent of the United States, and the people of the state," that the people inhabiting the proposed state of Montana agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof. Enabling Act, approved February 22, 1889. The solemnity of this condition imposed was understood by the framers of the state Constitution; for, by ordinance made irrevocable, as required (Ordinance No. 1, Constitution of the state of Montana), it was duly ordained:

"That the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof."

It has been, through action under the supreme power spoken of, that Congress has provided for the creation of forest reservations. The western states have greatly increased in population. The pursuits of the people are more varied than in territorial days. In Montana lands, once thought to be worthless for any purpose except grazing, are now in cultivation. Immense areas of supposed barren wastes are being successfully reclaimed. Thus have come changes that seemed impossible of realization a few years ago. With this development, it became obvious that the present and future welfare of the people should be guarded by protection of the forests. Agriculture, lumbering, mining, and live stock interests are all more or less dependent upon a permanent and accessible supply of water, wood, and forage. It need scarcely be said that plainly the whole policy of forest reservation rests upon legislation having regard for the future welfare, and is intended to foster and protect living and growing timber on forest reservations. Act June 4, 1897, c. 2, 30 Stat. 35, 36, may be called an essentially constructive statute.

In the futherance of this policy, and to make its execution effective, Congress also provided by the act just referred to that the Secretary of the Interior might make su ch rules and regulations, and establish such service, as would "insure the objects of such reservations, namely, to regulate their occupancy and use, and to preserve the forests thereon from destruction." This was a delegation of significant power to the Secretary of the Interior. It gave to that official authority to con-

struct in detail an administration which would make certain or "insure," as the law puts it, the will of Congress with respect to forest reservations. Protection of living timber, the cultivation of younger growths, protection against fire, protection against depredation—all are among the expressly enumerated features of the act. By explicit language, too, regulation of occupancy and use is included within the authority conferred, and was evidently regarded as a necessary part of the power which the Secretary should possess, to the end that the whole policy might be made as effective as possible. By other provisions in the law, the Secretary may permit, under regulations to be prescribed by him, uses of timber for domestic and other specific purposes. Entry upon the forest reserves is allowed for proper and lawful purposes, including prospecting and mineral development; as is also allowed the use of water on such reservations for domestic, or mining, or milling, or irrigation purposes. A reading of these several provisions makes it clear that Congress not only declare that the forest reserves should be controlled by the executive department, but meant that such control should be effective to insure protection. By requiring such a control to preserve, the law demands, not that there may be inaction or a mere nominal, yet weak and insufficient, exercise of authority, to be asserted or not, as the Secretary of the Interior may deem expedient; but a control vigorous enough to make as certain as possible the protection of forest growth, consistent always, of course, with such uses and occupancy of the reserve as the law fairly contemplates may be allowed.

Now the secretary of the appropriate department, exercising the authority just discussed, presumably having considered the matter of pasturing live stock within the forest reservations, among other rules, has promulgated this:

"The pasturing of live stock other than sheep and goats will not be prohibited in the forest reserves so long as it appears that injury is not being done the forest growth and water supply, and the rights of others are not thereby jeopardized. Owners of all live stock will be required to make application to the Commissioner of the General Land Office for permits to graze their animals within the reserves." Laws and Rules Governing Forest Reserves, Promulgated December 23, 1901.

In May, 1903, these additional rules concerning the pasturing of live stock were issued:

"Whenever it appears that grazing will do no marked damage to the reserves, it is allowed by the department; but until the Secretary has decided that it will do no harm, and that a certain number of either sheep and goats or cattle and horses may graze in a reserve, or part of a reserve, the grazing of stock is prohibited, and all parties responsible for its presence in the reserve prior to such decision by the Secretary of the Interior are liable to suits for trespass and damages."

"When the grazing has been allowed by the Secretary, all persons who desire the grazing privilege must make application on a blank form furnished by the department, and to be obtained from the forest supervisor. These applications must cover no more nor no less stock than the applicant actually owns and desires to graze in the reserve, and must show the brands of the stock and the grazing period allowed during the year."

"No stock of any kind is allowed to graze in a reserve without permit based upon the application made. All permits, except those for 100 head or less of

cattle and horses owned by persons who live in the reserve, are issued by the department on the application approved and forwarded by the supervisor."

"The total number of cattle and horses or sheep that may be allowed in a reserve is fixed by the Secretary of the Interior for the following year at the end of each grazing season."

Compilation of Laws and Rules and Regulations of October 3, 1903, pp. 62–65.

The dignity of these rules and regulations is equal to that of the laws themselves; for the statute makes a violation of either the law or the rules and regulations punishable as is provided for in the act of Congress of June 4, 1888, amending section 5388, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3649], which imposes a punishment for timber destruction on a reserve by fine or imprisonment, or both. In themselves, the rules are not beyond the power delegated to the executive authority that issued them. Nor can it be said the text of those quoted is at all out of harmony with the spirit or letter of the law. They do not prohibit the pasturing of cattle, unless it appears injury is being done the forest growth and water supply, but they do prohibit use if the Secretary believes harm will ensue. Manifestly, there must be some one clothed with authority to decide whether there is or is not injury being done the young trees of a particular locality. No unusual technical knowledge of tree life is requisite to understand that 100 head of cattle grazing together in a basin of limited area in the mountains will tramp down a great many very young trees, and will cut the soil along the banks of the creeks in a way that will injure tree life. Surely, therefore, unless regulation can prevent such intrusions by making them unlawful, protection of the reserve by preservation of the young trees cannot be had, and the power to delegate authority to make rules and regulations "to insure" the will of Congress can be of no practical good, except by fencing in the forest reserves, or keeping a force of government employés sufficient to police the boundaries thereof. But where, as shown, already, Congress has acted within its constitutional right, certainly it could delegate to the Secretary powers which it could rightfully exercise itself, in order to carry out and enforce the provisions of its laws; and I do not believe that to prevent trespass any physical barrier is indispensable on the part of the owner of the public lands. In the execution of the legislation concerning forest reserves, no attempt has been made by the rules heretofore quoted and adopted by the Interior Department to overthrow a law of the state. That the Secretary of the Interior could not lawfully make such rules is beyond dispute; but that as an administrative official he can adopt rules which carry out the will of Congress concerning the territory of the United States is well established by reason and authority.

In Dastervignes v. United States, 122 Fed. 30, 58 C. C. A. 346, the Court of Appeals for the Ninth Circuit upheld the rule of the Secretary of the Interior (No. 13), heretofore quoted in this opinion, as a valid and legitimate exercise of the authority delegated.

Judge Hawley, for the court, said:

"The national courts have universally upheld and sustained such rules and regulations made by the administrative officers, under the authority given by an act of Congress, whenever made necessary to carry out and enforce the provisions of the law. 'It is a general principle of law, in the construction

of all powers of this sort, that, where the end is required, the appropriate means are given.' United States v. Bailey, 9 Pet. 238, 255, 9 L. Ed. 113. There are many acts of Congress which are regulated by direct legislation, wherein general provisions are made concerning the subject-matter thereof, and in such acts, wherever it becomes necessary so to do, authority may be conferred and power given to an administrative officer, who is required by the law to act under its general provisions, to prescribe the details which must be pursued in the execution thereof, for, as was said by Chief Justice Marshall in Wayman v. Southard, 10 Wheat. 1, 43, 6 L. Ed. 253: 'Congress may certainly delegate to others powers which the Legislature may rightfully exercise itself.' "

As we have seen, the exclusive dominion and ownership being in the United States, it has a right to say that there shall be no use or occupancy of the reserve by stockgrowers, or it may allow occupation under rules and regulations to be made by a designated head of one of its executive departments. And if, by its forest reserve legislation, it has inaugurated a policy restrictive of privileges formerly not withheld from stockgrowers, no policy of the state can lessen the right of Congress to assert its full control over lands belonging to the general government whether by forbidding use or occupancy, or by declaring that there may be certain use, provided the Secretary of the Interior believes that no injury may be done. United States v. Tygh Valley Land & Cattle Company (C. C.) 76 Fed. 693.

If the use is lawfully forbidden, use cannot lawfully be had. Any other construction of the right of the general government would have to be rested on the foundation that the United States has only a limited dominion over its own lands, and that Congress is bound by an implied limitation that the policy of a state can control or circumscribe the power of legislation with respect to the public domain. Such a view would interfere with the exercise of the supreme power of Congress to pass laws making the forest policy effective. To state the doctrine contended for in its consequences: It would in effect be a denial of the right to prohibit trespass upon the national domain unless the state should see fit to conform to the policy of the general government by also forbidding trespass upon its lands. This would inevitably lead us to the conclusion that the constitutional power to which I have referred is not supreme, but is to be exercised under limitations reserved by the state, and that the power of national control over the lands of the United States is dependent upon the attitude of the state wherein such lands may lie.

I cannot yield to this deduction, for I firmly believe it fundamentally wrong in the reasoning that when the state was admitted into the Union, the then present policy of the state and the then prevailing attitude of the federal government toward stockgrowers formed a part of the compact of admission which requires a construction of the constitutional power of Congress over the public lands, whereby the exercise of that power is hampered or limited because of conditions that may have existed when the territory became a state. By these views I am expressing no opinion which, fairly construed, can be regarded as sustaining obtrusion by the general government upon the rights of the state, or which upholds the sovereignty of the one in any tendency to ignore the laws of the other.

To my mind the state has recognized, and expressly intended to recognize, the right of the general government to control its own lands; hence the citizen cannot successfully contend that there is a policy of the state which the general government is bound to recognize, enabling him to use and occupy lands of the United States. The state can lawfully forbid the United States to use or occupy lands belonging to it, as the United States has power to forbid the state or its inhabitants to use its domain. One or both may exert the powers respectively possessed; but if only one does, the other may not be heard to say that an ownership or control exists which is interdependent, so that the policy of the two must be similar and concurrent to make that of either effective. The facts before me illustrate an instance, not of a conflict of power, but simply where the need for exact preservation of the sovereignty of each within its appropriate sphere demands that the separate power of the general government over its property and the separate power of the state over its property be distinguished, and that the principle be sustained recognizing each as a landowner with free right to forbid trespass upon its own property. The difficulties of the question do not make it necessary to go farther, and, in advancing to a decision, I am but impressed by the wisdom of the underlying principle, whereby the harmony of the system of our government is to be preserved by upholding the sovereignty ceded to the general government as, within its sphere of action, independent of the policy or action of the state.

Believing, therefore, that the Secretary of Agriculture (to whom the authority formerly given to the Secretary of the Interior was transferred) has been lawfully authorized to make rules and regulations which forbid the occupancy or use of the reserve by defendant for grazing his cattle, unless by permission, and that defendant has knowingly allowed his cattle to go upon and remain on the reserve, not having a permit therefor, as required by the rules of the proper department, it follows that injunction will lie to prevent him from allowing his cattle to enter or feed upon the reserve.

So ordered.