# HAYES *v.* UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 29. · Argued January 28, 1897. — Decided May 23, 1898.

In the spring of the year 1825, when the grant of public land in controversy in this suit was made, the territorial deputation of New Mexico had no authority to make such grant.

THIS action was begun by appellant Hayes to obtain the confirmation of an alleged complete and perfect title to a tract of land of the area of 130,138.98 acres, situated in the county of Socorro, Territory of New Mexico.

In his petition Hayes averred that his alleged title was derived by mesne conveyances through one Antonio Chavez, to whom, on March 3, 1825, while the land was a part " of the public domain *of the Republic of Mexico*," a grant was made of the tract in question by the governor and departmental assembly " of the *Territory* of New Mexico." The exhibits attached to the petition, however, show, and counsel for the appellant admits in his brief, that the correct designations of the officials intended to be referred to were, respectively, the " political chief " and " territorial deputation."

The *testimonio* furnished Chavez, as translated from the original Spanish, is reproduced in the margin.[1]

---

[1] *Testimonio.*

Office of Secretary of the most excellent provincial deputation of the Territory of Santa Fé, of New Mexico.

Public session of the 16th day of February and 3d day of March, 1825.

I, the undersigned, secretary of the most excellent provincial deputation of the territory of Santa Fé, of New Mexico, do certify that in book second, wherein appears recorded the journal of the proceedings of its excellency, on page 41 of the book, it appears there was report made to said honorable body upon a petition, the tenor whereof, copied letter for letter, is as follows:

"MOST EXCELLENT SIR: I, Antonio Chavez, a republican citizen of the United Mexican States, and a resident of the town of our Lady of Belem, jurisdiction of this province of New Mexico, in the most ample and due legal form appear before your excellency and state, that finding myself very much crowded in the possession of my property and its appurtenances, as well in the pasturing of my stock as in the extension of agriculture, and desiring to remove to another place of greater capacity, with the honest purpose of enlarging both businesses, I apply to the superior wisdom of your excellency, to the end that, if such should be your high pleasure, you may deign to assign and adjudge me the tract called the San Lorenzo Arroyo, whose description and boundaries are: On the south the ranche of Pablo Garcia; on the north the little tableland of the Alamillo; on the east or west the Jara spring; and on the west or east the river known as the Del Norte; and the said land referred to in my petition being so uninviting, uncultivated, desolate and bleak, I earnestly believe, from your superior discernment, that your excellency, having in view and considering the matter, will have presented to you no obstacle to the granting, the adjudging and the assigning of the same to me; for, besides its contributing by cultivation and improvement to the benefit and security of the surrounding individuals, there will result to the province in general a great assistance and relief, inasmuch as at this point will be frustrated and prevented the incursions, ambushes and assaults of the enemies of our quietude and peace, who often invade and attack; and it will stop the exportation, deterioration and decrease of the little live stock they have left for the subsistence of the inhabitants and families of this needy province; wherefore I ask and pray that your excellency grant me what I pray for, whereby I will receive favor, grace and justice. I declare not to act with dissimulation, and as may be necessary, etc.

"ANTONIO CHAVEZ."

Session of the 16th day of February, 1825.

This document will pass to the honorable the political chief of this territory in order that, in continuation, he report whether the land that this

The juridical act evidencing the delivery of possession was read . in evidence from a duly certified copy of the record thereof made on the records of the probate court ·

party asks for pertains to that of the settlements of Socorro and Seviletta, and whether it is embraced in the same, and also whether, though it pertain to the settlements, it may, on account of their great extent, be granted to the petitioner without injury to a third party.

ANTONIO ORTIZ, *President.*

JOSE FRANCISCO BACA.

JOSE FRANCISCO ORTIZ.

PEDRO BAUTISTA PINO.

JUAN BAUTISTA VIGIL, *Secretary.*          MATIAS ORTIZ.

MOST EXCELLENT SIR: It is certain that the application of Antonio Chavez, a resident of Belem, refers to a part of the tract of Socorro and a portion of that which belongs to Seviletta, but it is also certain that on account of the great extent of both tracts and it, being where their possessions separate, far from being injurious to those settlements, there results to them a benefit, for the reasons which I will proceed to state, as follows: · The first and most important is the increase of the population to such a · degree that it will afford means to the said settlements of Socorro and Seviletta by guarding a portion of the entrances and exits of the savages, who, though at peace, come to rob as those at war endeavor to harass the same settlements or those surrounding or near them. The second, that to the residents of the said new settlements there remain most ample lands for pastures, fields, uses and transits, so that the land which may be granted to Chavez will cause them not the least scarcity, as on another occasion that granted to Sabinal did not to Belem, or even to Seviletta itself, though it was an appurtenance of the first. The third, that making to the said Chavez the grant he asks would produce the emulation desired, so that the desirable vacant lands of the Bosque del Apache and San Pascual may be settled, which lands upon the one and the other bank present the greatest advantages to stock raisers and farmers, for, although they may have lands in the centre of other settlements, these from their age are full of locusts and worn out by constant cultivation. Fourth. That the petition of Antonio Chavez has in it more of necessity than of effectation or covetousness, inasmuch as from that individual the Navajo tribe has taken the greater part of his live stock, and he requires a tract from which, through its productiveness, to reëstablish himself from the losses he has suffered during the war with the said tribe. Fifth, that the slightest damage not resulting to Socorro and Seviletta from the grant which Chavez asks, it is very probable that the people there, for their poverty is well known, will have a place where they may get employment which may furnish them subsistence and which (like their neighbors, who are subject to the same, almost, deplorable condition) they lack.

of the county of Socorro, and is also reproduced in the margin.[1]

It was averred that after receiving possession as aforesaid,

---

[1] For all these reasons and many others, which I omit in order not to trouble your excellency, I am of opinion that the petition of Antonio Chavez may be acceded to at once, to which the people of the settlements aforesaid will make no objection, unless some peevish person or other enemy of the welfare of his fellow-creatures should unjustly persuade them with pretexts which never lack against that which is not wanted. This is what I can report to your excellency in compliance with what was resolved and in accordance with the practical knowledge I have in the matter. God preserve your excellency many years.

Santa Fé, 25th of February, 1825.　　　　　BARTOLOME BACA.

Session of the 3d day of March, 1825.

Book two of the journal of the most excellent territorial deputation of New Mexico, on the 43d page thereof, says the reading of two reports was proceeded with, which his excellency the political chief then presented upon the petitions of Antonio Chavez and Pedro Jose Perea for lands, and this honorable body being advised thereof resolved that there be adjudged to the two individuals the land they ask, filing in the office of the secretary of this honorable body the original expedients, as is provided, ordered and customary in similar cases and furnishing the parties interested the corresponding *testimonio*, which will serve them as title, and with which Antonio Chavez will present himself to the alcalde of Socorro that he may place him in possession, and Pedro Jose Perea to Juan Esteban Pino, esquire, for the same action.

This agrees faithfully and legally with the original from which, as due testimony and by direction of the most excellent territorial deputation of New Mexico, I have taken the present copy, of which there has been furnished the parties interested the corresponding *testimonio*, which will serve them as title.

Santa Fé, March 5, 1825.　　　　　JUAN BAUTISTA VIGIL, *Secretary*.

　　　　　　　　　　　　　　　　　　　　(Vigil's Rubric.)

Fees for all that has been done, twenty dollars.

I, Juan Francisco Baca, citizen and constitutional alcalde of the jurisdiction of San Miguel del Socorro, under the authority conferred upon me in the premises, proceeded on the twentieth of April, of the year one thousand eight hundred and twenty-five, to place in possession the citizen Anto. Chavez upon the land that he applies for; and in obedience to the order which, under date of the fifth of March of the said year, said Chavez, a resident of the district of Santa Maria de Belem, presented me, borne upon the grant he exhibited to me from the most excellent provincial deputation of this Territory of New Mexico, with a report of the political

Chavez resided upon and cultivated the lands, and held and claimed the same as his private property in "fee simple absolute," free from all conditions or charges, "occupying the same openly, continually, notoriously, peaceably and exclusively" until his death, the date of which is not stated, when his widow succeeded to the title, and similarly possessed and occupied the tract until October 26, 1850, "when she duly conveyed all and singular the said tract of land upon a pecuniary consideration to Rafael Luna, Anastacio Garcia and Ramon Luna." Similar allegations as to possession, claim of ownership and cultivation were made concerning the subsequent conveyances in the claim of title.

It was averred that two reports upon the Chavez grant — the earlier favorable, the other unfavorable — were communicated to Congress by surveyors general for New Mexico; and it was further averred that prior to the making of the second report a committee of the House of Representatives reported

---

chief, which accompanies said grant, directing me to proceed to place Chavez in possession of the land he asks; in consideration whereof, I should proceed, and I did proceed, with two aldermen of this ayuntamiento, and two residents of this district, to whom I caused to be exhibited the order and the grant, the former being Anselmo Tafoya and Marcos Baca, and the latter being the citizens Jose Lionicio Silva and Augustin Trugillo, and as such alcalde did place the citizen Antonio Chavez in possession on the said land which he applies for, performing the ceremonies the laws require of me, assigning him for landmarks on the north, where the small tableland of the Alamillo begins; on the east, the del Norte River; on the south, a small forked cedar tree in the middle of the bend of the Pablo Garcia ranch, commonly so called, this little cedar being on the same side with the main road which is travelled toward said Socorro, on the side of the meadow; on the west, the spring known as the Jara spring. As alcalde aforesaid, in pursuance of direction, and in virtue and in form of law, I took the said Chavez by the hand and led him over his land, and he, in observance of the customary ceremonies, shouted, "Long endure the nation and our independence, and long live the sovereign," and he shouted and plucked up herbs, cast stones, and they praised the name of God, and by authority I left the party interested in peaceable possession, and I, under the authority which is conferred on me, authenticated and signed this, with two witnesses in my attendance, to which I certify on said day, month and year. JUAN FRANCISCO BACA.

Attending: VINCENTE SILBA.

Attending: JULIAN ORCANA. (X.)

back to that body a bill to confirm the claim, with a recommendation that it pass as amended. What, if any, action was taken thereafter by Congress, is left to conjecture.

It was also averred that the grant had been correctly surveyed by the United States, under the direction of the surveyor general for New Mexico, and a map showing the extent and boundaries of the tract was filed with the petition. About 20,000 acres of the land lying in the eastern portion of the tract delineated on the map was formerly appurtenant to the towns of Sorocco and Seviletta, referred to in the report of the political chief set out in the *testimonio*.

In substance, the answer of the United States averred that the grant to Chavez was void for want of authority in the granting body, and, further, that if the grant was valid, the survey did not correctly show the western boundary, and the area of the tract was much less than was claimed in the petition.

The Government also denied that the land granted was possessed, cultivated and occupied by Chavez and those claiming under him, as averred in the petition. An answer was also filed on behalf of the Atlantic and Pacific Railway Company, in which it set up title under its charter to odd-numbered sections of land within the limits of the premises described in the petition, and prayed that the petition of plaintiff be dismissed as to such sections.

Testimony was taken in the cause, and, after hearing, the Court of Private Land Claims entered a decree rejecting the grant and dismissing the petition. An application for a rehearing having been refused, an appeal to this court was allowed. The transcript of record contains a stipulation on behalf of the United States, admitting that on the trial " the petitioner proved sufficient proprietary interest in the subject-matter of this litigation to enable him to present and prosecute his petition herein."

*Mr. John H. Knaebel* for appellant.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

The main question presented by the contention of the parties is as to the power of the territorial deputation of New Mexico, in the spring of 1825, to make grants of public lands situated within the boundaries of that territory. We therefore pretermit an examination of the controverted issues as to possession in order to first address ourselves to the fundamental legal question upon which the decision of the cause substantially depends. To understand the issue to be considered it is necessary to recall a few facts connected with the overthrow of the dominion of Spain in Mexico and the establishment in the latter country of an independent government.

After the successful revolution by which Mexico was severed from the control of the crown of Spain, and following the deposition of the Emperor Iturbide, a representative body was assembled, which was known as the constituent Congress of Mexico, and this body adopted, on January 31, 1824, what is termed the constitutive act. In that instrument New Mexico was recognized as a state of the federation, and in article 7 it was provided that the territories of the federation should be directly subject to the supreme power which, in article 9, was divided into legislative, executive and judicial. 1 White New Rocopilacion, p. 375; Reynolds' Spanish and Mexican Laws, p. 33.

Under the provisions of the constitutive act what has been styled the general constituent Congress was elected, and on July 6, 1824, it was decreed that "the province of New Mexico remains a territory of the federation." Reynolds, p. 117. Subsequently, on August 18, 1824, the same Congress adopted a general colonization law which, in articles 11 and 16, vested the supreme executive power with sole authority to regulate and control the disposition of public lands in the territories. On October 24, 1824, the general constituent Congress adopted a permanent constitution, which, in article 5, enumerated, as one of the parts of the federation, the "territory of Santa Fé of New Mexico." Reynolds, p. 124.

It is manifest that the necessary effect of the decree of July 6, 1824, the colonization law of 1824, and of the constitution of October 24, 1824, was to deprive the officials of a territory of the power to dispose of the public lands, even though it be *arguendo* conceded that such power had theretofore been possessed by the officials who exercised authority within the area which was made a territory by the constitution.

But it is earnestly and elaborately argued that, as by the constitutive act New Mexico was recognized as a state of the federation, the Congress could not subsequently constitutionally reduce New Mexico to the rank of a mere territory, and that this court, in disposing of this case, must therefore disregard the Mexican constitution and hold that, as a state, New Mexico succeeded to the sovereignty and dominion of all the lands within its borders which formerly belonged to the king or crown of Spain, and, further, that we must in substance assume the acts of the officials who made the grant in question to have been those of state officials. The position thus taken, however, is so utterly in conflict with the facts and is so inconsistent with the case made by the petition as hardly to be entitled to serious notice.

Not only, as we have stated, had New Mexico been declared a territory prior to the passage of the colonization law of August 18, 1824, but such status has been reiterated in the fifth article of the Constitution of October, 24, 1824. Moreover, it is averred in the petition that the grant for which confirmation is sought was made by the "Republic of Mexico," through the territorial deputation of New Mexico, and it is specifically alleged that the land granted was prior to the making of the grant part of the public domain of the republic. And the muniments of title to the original grantee, put in evidence on behalf of the petitioner, support these averments, and clearly show a recognition of and execution by New Mexico of its status as a territory imposed by the decree of July 6, 1824, and the constitution of the following October. Thus, in the preamble of the *testimonio*, it is recited that the official who certifies to it, his certificate being

dated March 5, 1825, is "secretary of the most excellent provincial deputation of the territory of Santa Fé of New Mexico," and it will be remembered that this was the exact designation of the territory employed in the Constitution of October 4, 1824. On February 16, 1825, in referring the petition to the political chief for report, the territorial deputation alluded to that official as the political chief of the "territory." Again, in the extract from the journal of March 3, 1825, the record is referred to as "book two of the journal of the most excellent territorial deputation of New Mexico;" and in the juridical act the deputation is styled the "provincial deputation of this territory of New Mexico."

In this condition of the record there can be no reason suggested for our entering upon an inquiry as to whether New Mexico might, in 1825, have rightfully insisted that it was a state and not a territory of the federation, nor are we at all concerned with the question as to what, if any, rights in public lands were vested in a Mexican state in the year mentioned. The grant upon which, if at all, petitioner was entitled to relief in the court below was not made by state officials, did not purport to be a grant from a state, and was manifestly intended not to be such.

The lands covered by the grant being public lands of the nation, and not being subject to grant by the authorities of the territory of New Mexico, it follows that the title upon which the claimant relies vested no right in him and was clearly not within the purview of the act of Congress conferring jurisdiction on the Court of Private Land Claims, for obviously it cannot be in reason held that a title to land derived from a territory which the territorial authorities did not own, over which they had no power of disposition, was regularly derived from either Spain or Mexico or a state of the Mexican nation.

The contentions by which the plaintiff in error seeks to avoid the controlling effect of the foregoing considerations are as follows: 1st. That the territorial government of New Mexico had power to dispose of the public lands of the nation because it is not affirmatively shown that the colonization law

of the 18th of August, 1824, had been promulgated in New Mexico at the time the grant in question was made. 2d. Because even if it be conceded that the authorities of the territory were without inherent legal power to have made the grant, nevertheless there is a presumption that they were authorized to make it by the chief executive power of the Mexican nation, or that their action in making it was subsequently ratified by the like authority. 3d. That any defect in the title of the plaintiff in error is barred by prescription. 4th. That whatever may be the want of title in the plaintiff in error as to all the lands embraced in the grant except the portions thereof taken from lands appurtenant to the towns of Socorro and Seviletta, as to such lands there clearly is no want of title, because it is certain that as to such lands there was power vested in the authorities of the territory to make grant of the same, and hence, at least to the extent that lands of this character were embraced within the grant, there should be a confirmation. We will consider these contentions in the order stated.

1st. Whilst it is true the record does not affirmatively show that the colonization law of 1824 had been promulgated in the territory of New Mexico at the time the grant in question was made, it by the strongest implication gives rise to the inference that it had been. Besides, the legal presumption of promulgation arises in the absence of proof to the contrary. The granting papers show on their face that the constitution adopted subsequent to the colonization law had been promulgated in New Mexico, and the inference of fact is fairly deducible that such also was the case as to the earlier law of 1824. The constitution of Mexico in article 16, paragraph 13, made it the duty "of the supreme executive power to cause to be published, circulated and observed, the laws and the general constitution." 1 White New Rec. 398. In the absence of proof the presumption of *omnia rita* creates the inference that the duty was performed. But the question of promulgation is an immaterial one. By the constitution New Mexico was a territory. The grant itself, as we have seen, discloses this to be the fact, and describes the lands as

those of the nation. Whatever may be the foundation for
the claim that the states of the Mexican nation in virtue of
their autonomy succeeded to the right of disposition of the
public lands of the nation, as to which we express no opinion,
clearly such power did not obtain as to the territories, and
therefore whether or not the colonization law was promul-
gated becomes irrelevant, since the imposing of a territorial
status on New Mexico by the constitution operated to restrict
that territory to such powers alone as a territory might law-
fully exercise, and therefore had the effect of depriving it of
the power to alienate the national domain.

2d. The claim that because by the colonization law of 1824,
the chief executive was authorized to dispose of the public
domain, and by the regulation of 1828, adopted to carry out
the law of 1824, the executive delegated to certain territorial
officers power to grant lands, therefore the presumption must
be deduced that the act of the territory in granting the public
lands in question was either sanctioned by the executive at
the time of the grant or at a date subsequent thereto, was
duly ratified by such authority, is without merit.

By the first subdivision of the thirteenth section of the act
creating the Court of Private Land Claims that court and this
court on appeal are expressly prohibited from allowing any
claim under the act " that shall not appear to be upon a title
lawfully and regularly derived from the Government of Spain
or Mexico, or from any of the States of the Republic of
Mexico having lawful authority to make grants of land."
This manifest limitation upon the power of the court in
passing upon the validity of an alleged complete grant
requires that the court shall not adjudge in favor of validity
unless satisfied from the inherent evidence contained in the
grant, or otherwise, of an essential prerequisite to validity, viz.,
the authority of the granting officer or body to convey the
public domain.

In this respect the act of 1891 is materially different from
the statutes construed in the *Arredondo case,* 6 Pet. 691.
That case concerned a grant by the king of Spain of land in
Florida. The statutes under which the court exercised juris-

diction enjoined, among other things, as guides or rules of decision in passing upon a claim, "the stipulations of any treaty, and proceedings under the same; the several acts of Congress in relation thereto;" etc. In view of provisions of this character, the court, beginning on page 722, devoted much attention to the question, "Whether the several acts of Congress relating to Spanish grants do not give this grant, and all others which are complete and perfect in their forms, 'legally and fully executed,' a greater and more conclusive effect as evidence of a grant by proper authority." Reviewing such acts, the conclusion was reached that it was the intention of Congress that a claimant should not be required to offer proof as to the authority of the officials executing a public grant, but that the court should, in deciding upon a claim, assume as a settled principle that a public grant is to be taken as evidence that it issued by lawful authority. (P. 729.) And in the *Peralta case*, 19 How. 343, in a proceeding under the act of March 3, 1851, relating to lands in California, the doctrine of the *Arredondo case* was applied.

But in the act of 1891 the court is required to be satisfied not simply as to the regularity *in form*, but it is made essential before a grant can be held legally valid that it must appear that the title was "lawfully and regularly *derived*," which imports that the court must be satisfied, from all the evidence, that the official body or person assuming to grant was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified.

Controlled, as we are, by the grant of power conferred by the act of Congress, we are unable when the record discloses that the grant was not "lawfully and regularly derived . . . from any state of the Republic of Mexico having authority to make grants," to hold that it should nevertheless be confirmed because, although the proof convincingly shows that the grant does not conform to the requirements of the act of Congress, the grant yet must be held valid because of a supposed legal presumption. Indeed, if a legal presumption on the subject could be indulged in, the granting papers would

not authorize it to be invoked. They make no reference whatever to the colonization law, contain no allusion to the quantity of land contained in the tract granted, and if its area. was as now claimed the tract contained nearly three times the maximum quantity of land designated in the twelfth article of the colonization law of 1824, or which was authorized by the regulations of 1828. If the grant made in 1825 could be measured by the power for the first time conferred on territorial officers in 1828, such an unreasonable and retroactive rule would not help the grant. It was not in accord with the regulations of 1828, and hence finds no support from those regulations. *United States* v. *Vigil,* 13 Wall. 449, 452. Further, while it is reasonable to presume that any order or decree of the supreme executive of Mexico conferring authority to alienate the territorial lands or ratifying an unauthorized grant to the extent authorized by law was made matter of official record, the petition does not aver, and the grant does not recite, nor was there any evidence introduced showing a prior authorization or subsequent ratification. In fact, it was not even shown that at or about the time of the grant the territorial deputation habitually assumed to grant lands, particularly under circumstances which would justify an inference that the supreme executive was informed of such procedure.

3d. The contention that the land has been acquired by prescription is based upon the theory that the time for prescription ran against the government of Mexico, and to support this claim it is said that under the Spanish law, whilst prescription did not run against the king on subjects relating to his prerogative or inherent governmental authority, that with reference to the mere ownership of the public domain, the king, the Spanish nation and the national government of Mexico as their successor, were subject to the bar of the statute of limitations like any private individual. But a decision as to the soundness of this proposition is wholly unnecessary for the purposes of this cause. By the Spanish law prescription was divided into ordinary and extraordinary. The term of the ordinary prescription as to immovable prop-

erty was ten years, (Partidas 3, Law 18, Title 29,) and the term for immovable property by the extraordinary prescription was thirty years. (Partidas 3, Law 16, Title 29.) But the requisites for the ordinary prescription were, 1st, good faith; 2d, just title; 3d, continued and uninterrupted possession for the time required by law. (Hall, p. 30; 2 White, 83; Orozoco, Legislation and Jurisprudence on Public Lands, Mexico, 1895, vol. 1, p. 300.) The just title required did not include a title which was absolutely void and derived from one who by operation of law had no power whatever to dispose of the property. (Partidas 3, Law 11, Title 20.) In speaking on these provisions of the Partidas, Schmidt, in his Civil Law of Spain and Mexico (p. 290), says: "It is also necessary that the contract by which the property was acquired should be a valid contract. . Hence, a thing acquired by purchase, donation or any other contract made with an insane person cannot be acquired by prescription; nor property obtained from a minor or any other mode which the law holds invalid; but even in such cases the prescription of thirty years applies as is explained in paragraph 1 of the next section."

The provisions in the Partidas as to the distinction between the ordinary and the extraordinary prescription and the requirements essential to the former were substantially common to the civil law countries. Their practical equivalent was found in the Roman law. L. 24, C. *de rei Vindicat.*, L. 4, C. *de præscript. Longi temp.* They obtained in the intermediary law. They were reproduced in the Code Napoleon, Art. 2265. They are also adopted in the Louisiana Code. La. C. C. 3478 *et seq.* to 3484. Under all these systems, in interpreting the meaning of what is meant by just title, it has invariably been held that they do not embrace a title made by one who by operation of law had absolutely no power to convey. In speaking on this subject in *Francoise* v. *Delaronde*, 8 Martin, (La.) 619, where it was claimed that a sale, made at a time when the Spanish law was dominant, of a minor's property by a tutor, when by law the tutor had no authority to sell, could be the basis of the ten years' prescription because the purchaser

was in good faith and the deed was a "just title," the court, speaking through Matthews, J., said:

"From the order of the judge, it is presumable that the defendant believed that he gained a just and legal title to the lot, under the act of sale, supposing that all the formalities required by law had been complied with. In this he mistook the law: for the manner of sale and forms required by law were not pursued; *et nunquam in usucapionibus, juris error possessori prodest.* ff. eod. lib. 3, 31.

"However much the commentators of the Roman law have differed the one from the other, and the same person from himself at different periods, on the subject of mistakes of law, they seem to agree in this, that *juris error* is never a good foundation for acquiring property. 2 Evans' Pothier, 409, d'Aguesseau's dissertation, 2."

Pothier, in his treatise on Prescription (No. 85), says:

"In order that a possessor can acquire by prescription the thing which he possesses (speaking of course of the short or ordinary prescription) it is essential that the title from which his possession proceeds should be a valid title. If his title is void, a void title being no title, the possession which proceeds from it is a possession without title which cannot operate prescription."

In referring to the opinion of d'Argentrée, that a title absolutely void for want of legal power could not be the basis of a ten-year prescription, Troplong, in his treatise on Prescription, says, vol. 2, p. 905 :

"This truth is so palpable that it cannot be contested. It has been acceded to by all the writers, whether civilist or canonist. It stands out plainly in the exposition of the reasons for the adoption of the title of prescription (in the Code Napoleon) given by M. Bigot de Preameneu. No one, said he, can believe in good faith that he possesses as owner, if he has not a just title; that is to say, a title which would in its nature be translative of the right of property, *and which is otherwise valid.* It would not be valid if it was contrary to law, and even although it be void only for a defect of legal form, it could not authorize prescription."

And this reasoning at once suggests the necessary relation between the requirement of good faith and that of just title. In the Roman law the latter was substantially a mere resultant of the former. Marcadé Prescription, p. 194; Ducaurroy Inst., t. 1, p. 382 *et seq.*

Where the want of just title is the result of a legal incapacity on the part of the seller, such a cause not only operates to render the title not just in legal intendment, but deprives the contract of the essential ingredients of legal good faith. " If then," says Marcadé (p. 201), " believing your vendor to be the owner when he was not, you knew he was a minor, an interdict, or otherwise incapable of selling, you could not then buy from him with the conviction that the contract was true and regular, and you could not therefore prescribe by ten years." . . .

But here the deed on its face purported to be a conveyance of the domain of the nation by a territory thereof. The want of power in the territory was the resultant of the constitution and laws of the nation, and was therefore an incapacity by operation of law, with knowledge of which the grantee was chargeable. Thus, not only did the just title not arise, but the essential element of legal good faith was wanting. And these twofold consequences, that is, want of legal good faith and the absence of just title which necessarily arise where a sale is made of the public domain, by one wholly without authority to make it, is clearly stated by Orozoco :

" The title is lacking, because a void title cannot be alleged nor be made to serve to prove the just cause of possession. *Quod nullum est nullum producit effectum.* For, as Pothier says, 'in order that a possessor may acquire, by prescription, the thing he possesses, it is indispensable that the title from which the possession proceeds be a legitimate title.' If his title is void, a void title cannot be considered a title, and the possession that proceeds from the same is a possession without title, which cannot produce prescription.

" The just cause is lacking, because this is nothing else than a proper title to transfer dominion, and a void title does not transfer it.

"Finally, good faith is lacking, because this is based not on an error of fact, which may be excusable in us, but we can never take advantage of error as against law. *Nunquam in usucapionibis juris error possessori prodest. Juris ignorantiam in usucapione negatur prodesse: facti vero ignorantiam prodesse constat.*"

As the ordinary prescription could not apply, and as the necessary time for the extraordinary prescription under the Spanish law had not run at the time of the acquisition of the territory by the United States, and as, clearly, whatever may have been the rule as to the operation of prescription against the Spanish or Mexican governments, it did not run after the treaty against the United States, it follows that the claim of prescription is without foundation. We have discussed this question upon the hypothesis that the record showed such possession prior to the cession to the United States as would have authorized the running of prescription if there had been good faith and a just title, but because we have done this we must not be considered as so deciding or even so intimating.

4th. Nor is there merit in a contention made with respect to the portions of the land granted which were carved out of lands appurtenant to the towns of Socorro and Seviletta. It is asserted that, at least as to these lands, the power to grant existed in the territorial deputation. This claim proceeds on the hypothesis that a land law of the Spanish Cortes of January 4, 1813, (Reynolds, p. 83,) was in force in New Mexico in March, 1825. This law looked to the reduction to private ownership of "all public or crown lands, and those of the municipal domains and revenues, . . . . except the necessary commons of the town."

One half of the public and crown lands of the monarchy, excepting town commons, were reserved, in article VI, for *lucrative* alienation; while provision was made in clauses IX *et seq.* for disposition of the remaining public and crown lands, or of the farming lands of the municipal domain, in small tracts, the grants to be made by the common councils of such towns, subject to the approval of the provincial deputation. While counsel contends that this law empowered the legis-

lative bodies of the province, known as the provincial deputations, to dispose of the surplus lands of towns, that law does not expressly confer such authority. Article 4, which is relied upon, merely requires the deputations to make report to the Cortes as to the time and manner of carrying out the provisions of the law, to aid the Cortes in deciding what is best. Besides, this law of 1813 was held in *United States* v. *Vallejo*, 1 Black, 541, to be inoperative in Mexico after the enactment of the colonization law of 1824, and we are clearly of opinion that, as applied to a Territory, if entitled to the construction claimed for it by counsel for plaintiff in error, it was obviously repugnant to and inconsistent with the supreme power over the Territories reserved to the national government, particularly with the sweeping powers over lands in the Territories vested by the law of 1824 in the supreme executive power of the republic.

Moreover, if the town lands could have been granted under the supposed authority of the law of the Cortes of January 4, 1813, that law treated such lands as in the category of crown lands. The granting papers in evidence also warrant the inference that the lands were so regarded. Even then, though they were appurtenant to towns, they were subject to the disposition of the Spanish crown as part of the public domain, and authority to sell was not within the scope of territorial authority. *United States* v. *Sante Fé*, 165 U. S. 675, 708; *United States* v. *Sandoval*, 167 U. S. 278; *Rio Arriba Land and Cattle Co.* v. *United States*, 167 U. S. 298. Lands of this character being a part of the public domain they were subject necessarily to the authority of the Mexican nation, and the territorial officers were as absolutely void of right to sell them as they were to sell any other part of the public lands of the nation.

Of course the fact, if it be such, that the present claimant was a *bona fide* purchaser in good faith, who, in reliance upon the action of Congress with reference to similar grants, expended large sums of money on the faith of the validity of the title which he supposed he had acquired, cannot influence the action of this court. As said in *Crespin* v. *United States*, 168 U. S. 208, 218:

"If there be any hardship to the petitioners in the rejection of this grant, they must apply for relief to another department of the Government. We are bound by the language of the act creating the Court of Private Land Claims."

The decree of the court below is

*Affirmed.*

MR. JUSTICE SHIRAS dissented.

MR. JUSTICE McKENNA, not having heard the argument, took no part in the decision.