# THE PEOPLE OF PORTO RICO

*v.*

# FORTUNA ESTATES AND RUSSELL & COMPANY, S. en C.

San Juan, Law, No. 1191.

TITLE TO SEACOAST IN PORTO RICO.

**American Titles—Discovery.**

1. Discovery by explorers is a recognized source of European title in America. The natives have only a right of occupancy which the European government may extinguish.

**Title to Lands—Private Ownership.**

2. The long history of land ownership in Porto Rico under the Spanish rule shows the intention that individuals shall own land, and also intended protection of the Indians themselves, although both were not always carried out by the local authorities. The history of this legislation and of the Leyes de las Indias is given.

**Porto Rico—Title to Pastures.**

3. The right of private ownership of land carries with it pasture elsewhere, but pastures were finally declared of common use. Private titles were finally recognized in 1759.

**Shore Line—Mangrove Swamp.**

4. Mangrove swamp land is distinguished from the shore line. A grant will be presumed upon proof of adverse possession of twenty years.

Prescription—Against the State.
    5. In Spain a prescription of one hundred years against the
    state was adopted, and where the United States acquires before the
    expiration of one hundred years, it holds in trust.

Riparian Owner—Access.
    6. The riparian right is valuable property and sometimes access
    to navigation constitutes its whole value. . Such rights · below
    high-water mark are left in the United States to the local govern-
    ments.

Evidence—Uncertain.
    7. Where some of the land was shown to have been used for
    cotton and other purposes, but such parts were not identified, the
    court will not disturb the verdict in favor of the defendant.

Opinion filed May 4, 1921.

Mr. *Salvador Mestra,* Attorney General, and Mr. *Jos. A.
Loret,* Assistant Attorney General, for plaintiff.

Messrs. *O. B. Frazer, F. Manuel Toro* and *Nelson Gammans*
for defendants.

HAMILTON, Judge, delivered the following opinion:

This cause was brought in a local court, removed to the Fed-
eral court, and finally tried before a jury at the last term at
Ponce, resulting in a verdict for the defendant. Several points
involved have already been decided by opinions from time to
time, and the matter now comes up on application for a new
trial. A number of grounds are alleged, but they reduce them-
selves to the two points of title of the People of Porto Rico and
prescription.

People v. Fortuna Estates.

1. The plaintiff, People of Porto Rico, relies upon the discovery by Columbus as vesting the title to all lands in Porto Rico in the Spanish government, which ceded it by the Treaty of Paris to the United States, which, in turn, by the Foraker and Jones Acts has transferred its rights to plaintiff, the People of Porto Rico.

There is no question that under international law as now established discovery and exploration by Europeans inured to the benefit of the nations of the discoverers. The sovereignty and general property of the soil in such cases were claimed by the country in question by right of discovery. 3 Washb. Real Prop. 6th ed. § 2000. This is true, whether the country in question be Spain, France or Great Britain. It is regardless of any question growing out of the pretended division of territory by the Pope between Spain and Portugal. Johnson v. M'Intosh, 8 Wheat. 543, 574, 584, 5 L. ed. 681, 689, 691. The United States has recognized this principle and acted upon it. The American doctrine is that the Crown in question thus acquired an absolute title to the land, subject to the Indian right of occupancy, which itself might be extinguished by the act of the political power. Ibid. 587; Martin v. Waddell, 16 Pet. 367, 10 L. ed. 997. The Indians are not recognized as having any title except the mere right of occupancy which Congress has the right at any time to extinguish. United States v. Four Bottles Sour-Mash Whisky, 90 Fed. 720; People ex rel. Howell v. Jessup, 160 N. Y. 256, 54 N. E. 682.

2. There can be no question, therefore, that the origin of the title in this case must be held to be from the Spanish government in one form or other. It can be derived from the government only by express or implied grant, or by prescription.

Express grant is not set out in the pleadings and therefore may be disregarded for the purposes of this case.

Porto Rico is a small island, not even a hundred miles long by fifty miles wide, and has always contained a large population. The present industries are sugar, tobacco and coffee, but up to the American occupation coffee was possibly the largest interest. Previously, as in all the West Indian Islands, cattle occupied a large space in colonial industry, and this industry required the use of extensive lands for grazing. The fact that much of the Island was mountainous was not an obstacle in this regard. As a matter of history this court knows judicially that the principal permanent settlements at the beginning on the Island were at San German and San Juan, and also that San German was burned by the French and San Juan was burned by the Dutch in 1625 and by the British in 1595–7, with the result that whatever titles were conceded were destroyed or dispersed. The court may also be said to take judicial knowledge that what titles remained are in the custody of the Insular government and are largely unindexed and unarranged for general reference.

The history of land titles in the Spanish colonies is no short one. This and everything else is contained in the remarkable collection known as the Leyes de las Indias, itself a collection of all the laws issued from time to time by different Spanish monarchs, beginning with Ferdinand and Isabella. As to land this legislation shows an anxiety that colonists should acquire what they could use. There was the unfortunate concomitant that there was a repartimiento also of the Indians among these colonists, but this is a matter apart from that of the distribution of land. From the Laws of 1513, 1525 and 1596 we

People v. Fortuna Estates.

learn that the King conceded land to those who had resided in the colony for four years as their own, como cosa suya propia. Leyes de las Indias, Libro IV. title XII. Ley 1. There was a system looking to the erection of houses in towns, but also one as to the division of land for cultivation or cattle raising. In 1568 and 1586 it was directed that the viceroys and presidents should give den, land, lots and waters accordingly, and then occurs for the first time in the Indies the reservation that it must not be to the prejudice of a third person, tercero. Ibid. Ley 4. In many regulations it was provided that the Indians should not be injured, but unfortunately the execution of this had to be left to Spaniards themselves and was not carried out. In 1588 it was provided that a despacho signed by certain officers in the presence of escribanos should be given. Ley 8. Ley 9 provides for the granting to Spaniards of estancias y tierras. Some of these estancias were for cattle, ganados vacunos yeguas, puercos and the like, and for the future it should be provided that the Indian maize fields were not injured. Ley 12. In 1578 was a reaction, and the King declared, that, having succeeded to the ownership of the Indies, all baldias, suelos and tierras not previously conceded now descended to him and therefore those which were not possessed by just and true titles were to be reclaimed by the officials, except what was necessary for plazas, common lands, pastures and the like. This law, however, recognized that people should be protected who had good titles "o justa prescripcion poscyeren." Ley 14. In 1631 and 1680 it was declared that land should be left to those owners who were in peaceable possession, leaving to the officials the execution of the law. Certain titles of land had been granted by ministers who did not have the

People v. Fortuna Estates.

power, but had nevertheless been confirmed by the King and council, and these should be respected. Ley 15. In 1531, 1615, and 1617 it was directed that certain lands should be sold. Compromise was allowed of claims provided persons had had possession for ten years. Ley 19. In 1618 the right of prescription was expressly recognized, without mentioning the term. Ley 21.

While not applicable expressly to Porto Rico, it may be noted that there was a great deal of legislation and instruction in regard to lands about Havana. A direction was issued in 1735 that application should be made to the court, but less than a score of years afterwards it was recognized that this was impossible for most people on account of the expense, and some claimants were directed to be left in free and quiet possession without any molestation whatever. In 1797 the difficulty of proceeding was recognized caused by the disorder of the archives. In 1816 the multitude of complaints about land, realengos, amounted to a scandal, escandalo, causing inquietude among persons who had been in possession for a hundred years, and rules were provided to stop this great abuse. Among other things in fault of other titles just prescription, justa prescripcion, was to be admitted and respected, this meaning a possession of a hundred years where the land was uncultivated and fifty years where it was cultivated and worked, when possession had passed from father to son or otherwise by contract. Notoriety of prescription was recognized. 6 Zamora, Legislacion Ultramarina, 53–4.

It may be truthfully said that however ill the instructions were carried out the desire of the Spanish monarch was always for the prosperity of his people in the Indies. The defect pos-

XII. Porto Rico.—17.

sibly was in doing too much in Madrid instead of allowing it
to be done in the Indies.. Thus in 1834 it was ordered that
those who possessed lands should enjoy the security and con-
fidence due to the sacred right of property, debida al segnado
derecho de propiedad, so as to prevent that any one should
be disturbed in his peaceable possession.

3. There were special difficulties arising from time to time
in connection with titles in Porto Rico also. From the begin-
ning in each settlement the law or cedula de vecindad had
recognized that each colonist had a special piece of land, either
peonia or caballeria, to which were added pasture and other
rights and easements. Leyes de las Indias, Lib. IV. title XII.
Ley 1. In 1541 the government declared pastures, mountains,
and waters to be of common use and this caused great com-
motions and even murders. Salvador Brau, Historia de Puerto
Rico, 82. The result was that the law was not further carried
out. After two centuries, however, there came further trouble.
In 1746 it was ordered that in all the domains of Ultramar
titles dated after April 26, 1618, were void, and as to those of
earlier date the title must be shown under penalty of being
declared vacant. This was suspended by the death of Philip V.,
but renewed twelve years later, and created great commotion,
for there were many estancias in the Island, and titles had
been destroyed by war. The result was almost civil war on
the part of jibaros and others, and the governor submitted the
matter to the Council of the Indies. The result was that in
1759 there was a royal order recognizing the unquestionable
ownership of estancias in the hands of whoever possessed them,
and providing for the distribution of hatos realengos. Even
this was not satisfactory, and was only quieted by the inter-

People v. Fortuna Estates.

vention of the audiencia of Santo Domingo. Salvador Brau, Historia de Puerto Rico, 178.

4. Mangrove swamp land is to be distinguished from the shore line of the sea. Insular Government v. Aldecoa & Co. 19 Philippine, 505. In the case at bar there is shown a long possession by defendants and their grantors, and in fact a regular recorded title. A grant will be generally presumed upon proof of adverse, exclusive, and uninterrupted possession for twenty years. This rule will be applied as a presumptio juris et de jure whenever by any possibility a right may be acquired in any manner known to the law. United States v. Chaves, 159 U. S. 452, 40 L. ed. 215, 16 Sup. Ct. Rep. 57; Carter v. Walker, 186 Ala. 140, 65 So. 170, 171.

5. Originally prescription was not known to the law. It was introduced by the Roman prætor and its convenience led to its adoption in countries which derived their jurisprudence from Rome. As against the state there is ordinarily no prescription, Nullum tempus occurrit regi, on the idea of the dignity of the King and also the convenience to the public. The same rule is applied in regard to the United States, which is not bound by any statute of limitations, unless Congress so manifested such intention. United States v. Insley, 130 U. S. 263–265, 32 L. ed. 968, 969, 9 Sup. Ct. Rep. 485; Jourdan v. Barrett, 4 How. 169, 11 L. ed. 924.

Nevertheless some length of time ought to apply even as against the state, and in Spain the period of one hundred years finally came to prevail. This had not quite elapsed when the Treaty of Paris passed the title of Porto Rico to the United States. It is settled that limitations would not run against the United States when title has been derived from

People v. Fortuna Estates.

Spain. Crespin v. United States, 168 U. S. 208, 42 L. ed. 438, 18 Sup. Ct. Rep. 53. Whatever may have been the rule as to prescription against the Spanish government, it does not after the treaty run against the United States. Hayes v. United States, 170 U. S. 637, 42 L. ed. 1174, 18 Sup. Ct. Rep. 735. The same rule was applied in regard to lands in the city of Mobile. Doe ex dem. Kennedy v. Townsley, 16 Ala. 239.

In the case at bar, however, it would seem that this rule does not prevail. While undoubtedly, where the United States has finally taken title, the American rule ought to prevail for the future, the United States did not take title in this sense to Porto Rico. The Treaty of Paris expressly says that the future condition of the people of Porto Rico is to be provided for by Congress, and Congress did not act, except provisionally, until the Foraker Act of 1900. From that time on a definite government was organized in Porto Rico and it may well be that American rules as to limitations would apply. Before that time, however, everything was provisional. Under these circumstances the cession to the United States did not stop the running of the prescription, supposed to be one hundred years. That period was complete before the enactment of the Foraker law and protects the defendant.

6. There is a matter which should be mentioned if only to show that is is not decided in the case at bar. It seems unquestioned that defendant owns land adjacent to that sued for, and if that sued for is to be considered as the shore of the sea it would seem that the defendant is a riparian owner. It has been held that a riparian right is valuable property, including access to navigable water. Yates v. Milwaukee, 10

Wall. 497, 19 L. ed. 984. A purchaser on a river or bay takes title to the high-water mark in all titles derived from Spain. Mobile v. Eslava, 16 Pet. 251, 10 L. ed. 954. The United States takes title in such cases in new territory in trust for the future state. Weber v. State Harbor Comrs. 18 Wall. 57, 65, 21 L. ed. 798, 801; Shively v. Bowlby, 152 U. S. 1, 38 L. ed. 331, 14 Sup. Ct. Rep. 548. The title and rights of riparian owners in the soil below high-water mark are governed by the laws of the several states subject to the rights granted to the United States by the Constitution. The United States while they hold country as a territory have all the powers both of the national and the municipal government, and may grant for appropriate purposes titles in the soil below high water mark of tide waters. Congress has left the disposition of sovereign rights in such waters and lands to the control of the states after they have been admitted into the Union. Shively v. Bowlby, 152 U. S. 2, 38 L. ed. 332, 14 Sup. Ct. Rep. 548. One of the principal features of riparian ownership is that of access to navigable water; sometimes it constitutes the whole value of the riparian right. How far this applies to the defendant in the case at bar has not been developed. What local legislation there may be upon the subject has not been discussed. It will therefore be left until an appropriate case arises.

7. On the other hand, if the land sued for is not all seacoast, it must be in part high or fast land. There was some testimony tending to show that part of it had been cultivated in cotton. This would be the subject of grant and of prescription under principles above declared. If this was the case, however, and even if plaintiff had proved title to it, he has not shown to

People v. Fortuna Estates.

what part of the land this applies. In other words, even from the point of view most favorable to the plaintiff, he did not put the jury in possession of sufficient evidence to separate what he was entitled to from what he was not entitled to. The court could not undertake to set aside a verdict because the plaintiff had failed in this regard.

From any point of view, therefore, it would seem that the plaintiff is not entitled to recovery and consequently is not entitled to a new trial. The motion for new trial therefore is denied.

It is so ordered.