## SIMMONS v. OGLE.

1. Where, in a suit involving the right to lands, the equities of the respective parties are equal, the legal title must prevail.

2. Against the United States the presumption of a party's claim of right to a tract of public land, growing out of his mere possession of it, is but very slight, and so long as the United States retains the legal title the Statute of Limitations does not run against it, nor does any equity in his favor arise from such possession and the non-assertion of that title.

3. A. recovered in ejectment possession of lands conveyed to him by the United States. The judgment defendant thereupon filed his bill, setting up that B., under whom he claimed, had long previously to the inception of A.'s title duly entered them at the proper office, and praying that A. be compelled to convey the legal title to the complainant. Neither the receipt of the receiver to B. for the purchase-money, nor the register's certificate of purchase entitling B. to a patent, was produced or accounted for, and the defendant's evidence strongly conduced to show that the papers never existed and that the sale was never made. Upon the facts, — *Held*, that the bill should be dismissed.

APPEAL from the Circuit Court of the United States for the Southern District of Illinois.

The facts are stated in the opinion of the court.

*Mr. John W. Ross* and *Mr. Franklin A. McConaughy* for the appellant.

*Mr. James L. D. Morrison* for the appellee.

MR. JUSTICE MILLER delivered the opinion of the court.

Simmons recovered, on the seventeenth day of January, 1878, a judgment in ejectment against Ogle, for the possession of the south half of the northeast quarter of section three, township one north, of range nine west, in St. Clair County, Illinois, and under the proper writ was placed in possession of it. The title on which he recovered was a patent to himself from the United States, dated June 12, 1874. Ogle thereupon instituted the present suit in chancery to compel a conveyance of the legal title thus established by Simmons to himself, on the ground that he had a superior equity, by reason of which the title in Simmons should be decreed to be held by him in trust for the benefit of Ogle. After answer, replication, and a full hearing on the evidence, the court granted the prayer of the bill, and from that decree Simmons brings the present appeal.

There is much conflict in the testimony. Some parts of it are irreconcilable, and the result of it in producing any very clear conviction of the true state of the case is unsatisfactory, especially in regard to the foundation of the right of complainant to be the true equitable owner of the land. The fact which he takes upon himself to establish is that, on Dec. 30, 1835, one John Winstanley bought the land of the United States, at the land-office in Edwardsville, and paid for it. The subsequent conveyances and transfers from Winstanley to Ogle are not controverted, and if the purchase and payment now stated and alleged in the bill were satisfactorily established by the evidence, the decree should be affirmed.

The evidence by which this proposition is supported is of two classes.

1. The records of the Edwardsville land-office, now found in the General Land-Office at Washington, where they were removed by law.

2. The conveyances and other proceedings by which, if Winstanley ever had any right, it became vested in Ogle, and the actual possession of the land by Ogle.

As regards the first of these, the records of the Edwardsville land-office show a written application by Winstanley at that office, on the thirtieth day of December, 1835, for the purchase of the land. It is numbered 13,164, and shows the quantity of the land to be 84.46 acres, and the price to be paid $1.25 per acre.

There is, also, an entry on the books of the office, of which the following is a copy, and which is photographed in the record: —

"No. 13,164.

"Dec. 30, 1835, to John Winstanley, of St. Clair County, State of Illinois, for S. ½ NE. ¼ section No. 3, township No. 1 north, range No. 9 west of the third principal meridian, containing $84\frac{46}{100}$ acres, at $1.25 per acre.   $105.57.

"S. H. Thompson, *Register.*"

These, it is said, being the original entries made in the records of the local land-office, are sufficient evidence of the purchase and payment for that land by Winstanley, and that no

successful contradiction of them is found anywhere. When to this is added the conveyance by Winstanley to William C. Anderson of the same land, in 1837, and that Anderson's title came to Ogle, who, in 1851, took possession of the land and held it until his removal under the action of ejectment brought by Simmons against him, the case of complainant is substantially stated.

As regards the weight to be given to the possession of Ogle, it is to be considered that whether he had the equitable right or not, neither the Statute of Limitations nor the equitable doctrine of lapse of time could begin to have effect against any one until Simmons purchased of the United States and obtained his patent in 1874, for up to that time the legal title was undeniably in the United States. If this had not been so Ogle would have successfully pleaded the Statute of Limitations against Simmons in the action at law. No laches could be imputed to Simmons, who brought suit very soon after he received his patent. Nor can laches be imputed to the United States, either as a matter of law or on any moral or equitable principles. For so common is it for squatters and trespassers to settle on the lands of the United States, and so indulgent are the laws in encouraging such settlements, and so numerous are these settlements without claim of right, and such is the impossibility of resisting or ejecting the settlers, or of efficiently asserting the right of possession by the government, that the weight of the inference in favor of any claim of right, whether legal or equitable, against the United States, growing out of mere possession, is very slight indeed.

Nor do the sale and conveyance by Winstanley to Anderson afford any legal evidence of his right to do so, and very little that he believed himself to have such right. He could never be made responsible for more than the purchase-money, and, knowing what entries were on the books of the local landoffice, he might well be willing to take the money and the chances. The evidence, therefore, in support of the entries on the books of the land-office do not add greatly to its force, and the complainant's case must rest on the intrinsic probability arising from those two pieces of evidence, that Winstanley bought and paid for the land.

If either of these entries had stated the purchase and payment in words, they are open to the weakness which arises from the fact that in all such completed sales two other documents of superior probative force usually attend the sale, one of them invariably, neither of which is here produced or shown ever to have existed. The most conclusive of these is the patent. There is no pretence here that any patent ever issued to any one on Winstanley's purchase. It is proved that he was a careful business man, much accustomed to dealing in lands, and as he had sold this land, and made himself liable by a warranty deed, he would naturally have made that title secure by procuring the issue of the patent.

It is, however, well known that early purchasers of the public lands were careless about their patents. But as a reason for this, they attached primary importance to the paper issued when a sale was made, and delivered to the purchaser by the register and receiver of the land-office, called a certificate of entry.

This is a paper in two parts, the first of which is signed by the register, giving a description of the land, the amount paid for it, the name of the purchaser, and a statement that on its presentation at the General Land-Office a patent would be issued to the purchaser. The second, signed by the receiver, is a simple receipt for the payment of the price, and a description of the land for which it was paid.

The statutes of almost every State and Territory in which the public lands have been sold provide for the registration of this instrument, and in all actions concerning title or possession declare it to be *prima facie* evidence of title. See Hurd's Rev. Stat. of Illinois, sect. 31, c. 30, p. 271, and sect. 20, c. 51, p. 508. In the estimation of the people generally, and in the practice of the courts, it became the efficient substitute or equivalent of the patent, and in regard to millions of acres of land the patent either was never issued, or if issued never delivered, but remains in the local or the general land-office, subject to the call of the owner.

In the case before us there is no evidence whatever, except presumption, that this certificate of entry ever had an existence. In the absence of the patent, it is the instrument of all others

which it is important to produce, or if it cannot be produced, to account for its loss.

The only effort to do this is an affidavit of Ogle, that he went down to John Winstanley's and examined through all his papers and did not find it. He wrote to the son of Anderson, to whom Winstanley sold it, who replied that he could find no paper of the kind. He went to the Commercial Bank of Cincinnati, which at one time had a mortgage on the land. They said a majority of the papers of the bank had been burned. So he failed to get the certificate, or any information about it. "I do not know where it is, nor have I ever seen it," he says.

This would have been sufficient to authorize the introduction of a copy in evidence, if any copy existed. But no copy is produced, for the reason that no human being has been found who can say that any such paper ever existed, or was ever seen by any one. When we consider the number of persons interested in the property through Winstanley, there being several mortgages and intervening conveyances between him and Ogle, and that the certificate of entry, if ever made, could only have been forty years old when this suit was brought; that many persons must have been alive who had been interested in the title; this total absence of all evidence of its existence, no one ever having seen it, nor any copy of it, nor any record of it under the Recording Acts of Illinois, — the inference that such a paper was made and delivered to Winstanley is very much shaken.

When we turn to the evidence of defendant there is much positive testimony to convince us that no such paper was ever delivered, and no such sale ever made.

There are in pencil mark on the page where the application of Winstanley for this land, numbered 13,164, is found, the following words: "13,164.   Changed to NE. ¼ of NW. ¼, 9, 2, N. 9, W. 3d."

The transactions of the local land-offices are forwarded regularly to the General Land-Office at Washington, and accurate copies or duplicates are there found of all the transactions in the local offices, and in the present case the original records of the Edwardsville office, long since closed up, are in the General Land-Office.

Among these are found the following: —

"No. 13,164.                    LAND-OFFICE AT EDWARDSVILLE, ILL.,
                                         "December 30, 1835.

"It is hereby certified that, in pursuance of law, John Winstanley, of St. Clair County, Illinois, on this day purchased of the register of this office the lot or west half of the northwest quarter of section number nine, of township number two north, in range number nine west of the third principal meridian, containing eighty acres and ___ hundredths of an acre, at the rate of one dollar and twenty-five cents per acre, amounting to one hundred dollars ___ cents, for which the said John Winstanley has made payment in full as required by law.

"Now, therefore, be it known that on presentation of this certificate to the Commissioner of the General Land-Office, the said John Winstanley shall be entitled to receive a patent for the lot above described.

                                         "S. H. THOMPSON, *Register.*

"No. 13,164.                    RECEIVER'S OFFICE, EDWARDSVILLE, ILL.,
                                         "December 30, 1835.

"Received from John Winstanley, of St. Clair County, Ills., the sum of one hundred dollars and ___ cents, being in full for the west half of the northwest quarter of section number nine, township number two north, range number nine west of the third principal meridian, containing eighty acres and $_{100}$, at the rate of $1.25 per acre.

                         "75 B. U. States
                         "25 Specie.
"$100.                   ———
                         "$100                   "B. F. EDWARDS, *Receiver,*
                                                 "By WM. H. RIDER."

It will be observed that this certificate of entry bears date the same day of Winstanley's application for the other piece of land. That it bears the same serial number as that application throughout, up to the issue of the patent, which is very important, as though it is possible Winstanley might have entered two pieces of land on the same day, they would necessarily have been separate entries and would not have borne the same number.

Upon this certificate No. 13,164 there was issued on the second day of December, 1839, to John Winstanley a patent

for the land there described; for the other land no patent was ever issued to him.

Another circumstance confirming the truth of the pencil memorandum is found in the cash-book or register of receivers' receipts at Edwardsville, now on file in the General Land-Office. In that book, which is kept in tabular form, it is shown that on Dec. 30, 1835, on certificate No. 13,164, there was paid to the receiver, by John Winstanley $100, for the W. ½ NW. ¼, S. 9, T. 2, R. 9, 80 acres; and as the transcript is complete for that day no other receipt of money from Winstanley is shown. The quarterly account of the receiver with the department shows precisely the same thing.

So that we here have the evidence of these records that Winstanley bought and paid for another piece of land on that day, under cover of the same No. 13,164 as to application and entry; that the price was $100, and not $105.46; that no certificate of entry is known to have ever been made for the tract first applied for, no evidence that any money was paid for it, no entry on the cash-book or quarterly account of the receiver of the amount for which the land in controversy could only have been sold; but ample evidence that on that same day, and under the same entry number, Winstanley bought and paid for another piece of land near by, at the same office, for which he received the usual certificate of entry, and for which the patent was issued.

We cannot resist the conclusion, in the presence of what is positively shown by the records, and what is wanting in the evidence of complainant in regard to the existence of a certificate of entry of this land, that the pencil memorandum whenever it was made is true, that on the same day, and before the purchase was finally completed, Winstanley changed his purpose, and bought and paid for the other piece of land, and that the officers omitted to make the requisite change in the application while making the transfer and preserving the original number.

If, however, this were not so clear, the appellant here has the legal title and the possession, without fraud or any unfairness. He found the land subject to entry by the records of the land-office, and he bought and paid for it and has the title. In

such case the maxim applies in all its force, that better is the condition of the defendant. The equities of the parties being equal, the legal title must prevail.

Instead of the weak case made by appellee, the position of affairs required him to make clear and satisfactory proof of his superior equity. This he has signally failed to do.

> *Decree reversed, and cause remanded with directions to dismiss the bill.*