**BERGER v. OHLSON et al.**

No. A–1053.

District Court of Alaska. Third Division. Valdez.

Sept. 30, 1939.

W. N. Cuddy, of Anchorage, for plaintiff.

J. W. Kehoe, U. S. Atty., of Seward, for defendants.

HELLENTHAL, District Judge.

This cause is before the Court on final hearing on the amended complaint, answer to the amended complaint, affirmative answer and the reply.

The plaintiff, in his amended complaint, alleges that he is a citizen of the United States, owner of real property and a tax payer in the City of Anchorage, Alaska; that he is the owner of the Discoverer, a hundred-ton motorship, and the Kasilof, a sixty-ton motorship; and is licensed, by the United States Government, to transport freight and passengers from Seattle, Washington, to Anchorage, Alaska; that for a number of years last past, he has been and is regularly engaged in the summer months in transporting freight and passengers from Seattle, Washington, to

Anchorage, Alaska, and also transports freight and passengers between points on Cook Inlet, including Anchorage, and that he is also engaged in lightering cargo ashore at Anchorage from vessels moored in the waters of Cook Inlet; that the defendants are respectively the general manager and acting general manager of the Alaska Railroad; that the SS Lake Francis carried freight for Anchorage, Alaska, a considerable portion of which freight was building material and supplies for the construction of a school building at Anchorage, which school building is a project of the United States and partially financed by the United States; that the plaintiff under contract with the Alaska Transportation Company, the charterers of the Lake Francis, was on the 25th day of May, 1938, employed in the lightering of cargo from the said SS Lake Francis, anchored off-shore, to the dock known as the City Dock at Anchorage, Alaska; that there is a public roadway, acquired by the public by continued adverse and uninterrupted use over a long period and dedicated to the public, which roadway leads from the City Dock to the Town of Anchorage proper; that the City Dock is a public dock, not the property of the Alaska Railroad, but constructed and maintained by the City of Anchorage, over which dock the Alaska Railroad has never exercised any control or supervision until the commission of the acts complained of, on or about the 25th day of May, 1938, and thereafter; that on the said 25th day of May, employees of the Alaska Railroad, acting under the control and supervision of the defendants, in violation of law and the rights of the plaintiff and the citizens of the City of Anchorage, wilfully, maliciously and without justification, did obstruct said roadway leading to and from the said City Dock by switching railroad cars across said road and allowing same to remain standing thereon; that the defendants claiming to act on behalf of the Alaska Railroad, demanded of plaintiff wharfage for cargo coming over said City Dock and ground adjacent thereto; that subsequently, and on the 27th day of

May, 1938, the employees of the Alaska Railroad, acting under the supervision and control of the defendants, interfered with the removal of cargo from said City Dock, refusing to permit any of said cargo thereon to be removed; that in order to obtain the said cargo, the plaintiff offered to place a good and sufficient bond for the payment of wharfage, if any should be found to be due, but such offer was refused by the defendants; that plaintiff then offered to place money, sufficient to pay said wharfage in full, in escrow, pending the determination of plaintiff's liability for such wharfage, which offer was also rejected by defendants. That by reason of the acts of defendants in obstructing said roadway and interfering with the removal of cargo from said City Dock, the plaintiff has been forced to discontinue lighterage to the detriment of the plaintiff and all of the tax payers of the City of Anchorage; that unless defendants are restrained and enjoined they will continue to interfere with discharge of cargo at said City Dock and unlawfully prevent use of the City Dock and roadway to the irreparable damage of plaintiff and to the damage and harassment of the public and citizens of the City of Anchorage, Alaska; that the damage is irreparable, and plaintiff has no plain, speedy and adequate remedy at law; and prays for the defendants to appear and show cause why they should not be enjoined from the acts complained of during the pendency of this cause, and that upon hearing a temporary injunction be issued against the defendants, restraining and enjoining them from the commission of the acts complained of and that upon final hearing said injunction be made permanent.

The defendants have filed their answer, in which they admit that one is the general manager and the other was the acting manager of the Alaska Railroad; admit they have demanded wharfage for cargo handled over the so-called City Dock; admit that they refused to permit removal of freight from the wharf or its land without payment of wharfage charges; admit that the Alaska Railroad is a

governmental agency and is not subject to suit and deny all the other material allegations of the complaint and affirmatively answer that one of the defendants is the general manager and the other was the acting manager of the Alaska Railroad; that the Territory of Alaska was purchased from Russia; that the wharf and roadway mentioned in the complaint are located upon lands bordering on Cook Inlet, a tidal and navigable body of water; that the Alaska Railroad is operated by the United States under authority of an Act of Congress; that the President of the United States, by virtue of authority vested in him by said Act of Congress, was authorized to adopt and use a name by which to designate the railroad, to employ such officers, agents or agencies necessary to enable him to carry out the purposes of the Act; to locate a route for a line of railroad, to construct and build a railroad, to acquire rights of way, terminal grounds; to build or otherwise acquire docks, wharves, terminal facilities; to receive compensation for the transportation of passengers and property and to perform generally all the usual duties of a common carrier; that the President was by said Act of Congress further authorized to withdraw, locate and dispose of, under such rules and regulations, such area or areas of public domain for railroad and townsite purposes as he may from time to time designate; that said Act of Congress also provided that Terminal and station grounds and rights of way through lands of the United States are granted for the construction of said railroad and that the President may in such manner as he deems advisable make reservations of such lands for terminals and docks in connection with the construction and operation of said railroad as he may deem necessary and desirable.

That by virtue of an Act of Congress of March 3, 1891, as amended, 16 U.S.C.A. § 471, the President established the Chugach National Forest which covered the premises described in the amended complaint; that all of the lands described in plaintiff's complaint remained so set

aside from the public domain and were thereby reserved from occupation until after the passage of the Act of Congress on March 12, 1914, 48 U.S.C.A. § 301 et seq., when Woodrow Wilson, President of the United States, by Executive Order Number 2242, issued August 31, 1915, withdrew from the Chugach National Forest the lands described as follows: "Beginning at the corner of Sections 7, 8, 17 and 18, T. 13 N., R. 3 W., Seward Meridian, thence East 39.95 chains to the true point for the quarter section corner on the south boundary of Section 8; thence North 0°05½' West 39.96 chains; thence West 99.96 chains along the quarter section line through Sections 8 and 7 to its intersection with ordinary high water mark on the east shore of Knik Arm; thence southwesterly along ordinary high water mark on the eastern shore of Knik Arm and crossing the mouth of Ship Creek to the northwest ·corner of Anchorage Townsite; thence East 89.06 chains; thence North 0°08' West 14.26 chains to the point of beginning, containing 551.63 acres;"

That said lands thus withdrawn from the Chugach National Forest were thereby withdrawn from settlement, location, entry or other disposition for use of the Alaska Railroad as its Terminal Reserve; that the above described lands have always heretofore been and at all times mentioned in the complaint herein and now are reserved as above alleged and are now and have always heretofore been the exclusive property of the United States of America and not subject to settlement or acquisition in any manner but by express grant of the United States of America; that the plaintiff never has had and does not now have any right, title nor interest in or to any part of the Alaska Railroad Terminal Reserve; that the City of Anchorage, a municipal corporation, never has had and does not now have any right, title nor interest in or to any part of the Alaska Railroad Terminal Reserve; that the Court has no jurisdiction of this cause for the reason that the United States of America is the real party in interest herein; that the SS

Lake Francis left Anchorage June 10, 1938, her entire cargo discharged; that plaintiff is not now engaged in lightering freight from said vessel; that plaintiff has completed his lightering contract; that defendants never have interfered with plaintiff in his operation of the MS Discoverer or the MS Kasilof.

In reply to the affirmative answer, the plaintiff admits that the defendants are the general manager and acting general manager of the Alaska Railroad, but avers that he has no knowledge as to the present duties of the defendant J. T. Cunningham; admits that the Territory of Alaska was purchased from Russia; that the wharf, dock and roadway mentioned are located upon lands bordering upon Cook Inlet, a navigable body of water; that the Alaska Railroad was constructed as mentioned in the answer; that the President of the United States was authorized to do the things set forth in the answer; that he has no knowledge of the establishment of the Chugach National Forest and therefore denies the same; that he has no knowledge of the withdrawal and establishment of the Alaska Railroad Terminal Reserve and therefore denies the same; denies that the plaintiff and the City of Anchorage do not have any right in the Alaska Railroad Terminal Reserve; denies that the Court has no jurisdiction; admits that the SS Lake Francis has been fully discharged; denies that the defendants never have interfered with the plaintiff in his operation of the MS Discoverer and the MS Kasilof and renews the prayer set forth in the Complaint.

This matter previously came before the Court on an order to show cause, at which time the evidence introduced showed that the dock and roadway in question were all on tide lands of Cook Inlet and below the line of mean high tide and the Court being of the opinion that no lands below mean high tide were reserved by the Presidential Order referred to as the Alaska Railroad Terminal Reserve, enjoined the defendants as prayed for in the complaint.

The evidence adduced at the present hearing conclusively shows that the dock, known as the City Dock, is built partially on tide lands and partially on uplands; that the road leading from the City Dock to the City of Anchorage is wholly on uplands, lands above the line of mean high tide, on ground within the Alaska Railroad Terminal Reserve; that said Alaska Railroad Terminal Reserve was created from lands theretofore in the Chugach National Forest Reserve on August 31, 1915, by Presidential Order, Executive Order No. 2242. The evidence shows that prior to the Executive Order above mentioned, several persons, property owners in the Anchorage Townsite, used the lands at and near where the present roadway is constructed for the purpose of hauling supplies over the same from the waters of Cook Inlet to the Anchorage Townsite and commenced the construction of a roadway over said lands; that thereafter some of the persons who had started construction of said roadway took leases from the predecessors of the Alaska Railroad, the Alaska Engineering Commission, to occupy and use the lands bordering on Ship Creek, a navigable arm of Cook Inlet, near the present City Dock, and continued to use and improve the roadway before mentioned; that shortly thereafter the Alaska Engineering Commission purchased the boats, dock and equipment of one of these tenants and improved the docking facilities; later on, in 1923, the City of Anchorage purchased a scow from the Alaska Railroad, which was moored in the vicinity of the present City Dock and was used by the public generally as a dock; that in connection with said dock, the roadway leading from the dock to the City was also used; that in 1928 the City of Anchorage built the present City Dock and continued to improve the dock and the roadway leading from the said dock to the City of Anchorage, in connection with which improvement the plaintiff furnished some pilings either in 1928 or 1932; that the dock at present has a thirty foot face, extending eighty feet below the line of mean high tide and 50 feet above the line of mean

high tide and the water reaches the face of said dock about two hours out of every twelve; that said dock was built and maintained by the City for the purpose of accommodating the small boats and was not intended nor fit for use by large boats or for the unloading of scows or lighters; that at some time (it is not made definite by the evidence) the plaintiff had his agent, the Alaska Transfer Co., build a cribbing and make a fill-in, so that scows could be landed and unloaded alongside of the dock; that the use made by the public of said City Dock and roadway was largely in connection with persons and merchandise going to and from Cook Inlet ports and was also used by the small boats of the Mosquito Fleet.

There is no evidence of any large ships being unloaded by lightering over the City Dock prior to May, 1938, except that the plaintiff, in 1934, 1935, 1936 and 1937, when the tides were right and when a $5 per ton wharfage was demanded on the other docks, at various times brought cargoes from the Discoverer on scows to and over the City Dock or the ground adjacent thereto and at some times up to 1936 landed the Discoverer at the dock; that the plaintiff did not use the City Dock during the season of 1939 because the tides were too small; that this use made of the City Dock and roadway was, as far as the use was known, with the tacit consent of the Alaska Railroad.

The plaintiff, by virtue of the City building and maintaining a public wharf or dock, known as the City Dock, on the shore of Cook Inlet, a navigable arm of the Pacific Ocean, undoubtedly has a right to land at and unload on that part of said wharf that is below mean high tide. Sheldon v. Messerschmidt, 9 Cir., 247 F. 104, 159 C.C.A. 322, 4 Alaska Fed. 658; Decker v. Pacific Coast S.S. Co., 9 Cir., 164 F. 974, 3 Alaska Fed. 229; Columbia Canning Co. v. Hampton, 9 Cir., 161 F. 60, 88 C.C.A. 224, 3 Alaska Fed. 65. The plaintiff likewise has a right to cross the railroad right-of-way at any established crossing and to have reasonable cross roads established. The own-

ership of a right-of-way of the railroad is in the nature of an easement, a qualified right which must be used and exercised in connection with the rights and privileges of the public.

22 Ruling Case Law, p. 862, § 113: "The nature of railway service requires exclusive occupancy. And it is well settled that a railroad company is entitled to the uninterrupted and exclusive possession and occupancy of its tracks and all of its right of way necessary for conducting its business, except when built on the public highway or over public crossings. * * * "

51 C.J. p. 596, § 264: "Mutuality of Rights of Company and Public in General. Unless an exclusive right is granted to the railroad company by or under the authority of the legislature, in clear and explicit terms or by necessary implication, the right given to a railway company to lay down and use tracks in a street or highway is not exclusive, but, as a general rule, is merely the right to use the street or highway on equal terms with, and subject to, the general public's right to occupy and use the same; and the rights of each therein must be exercised with due regard to the rights and nature of the use of the other. * * * "

Atchison, T. & S. F. Ry. Co. v. General Electric Ry. Co., 7 Cir., 112 F. 689, 691:

"The appellant has a great railway system extending between Chicago and the Pacific Coast, with valuable terminals in Chicago held under leases, but its right to maintain this bill must be tested by its property interests in the crossing at Dearborn street, and not by the mere vicinity of its important interests and connecting tracks. * * *

"It is equally well settled by the uniform line of decisions in the same state that the use of a street by a steam railway is legitimate when duly authorized, but that no exclusive use is conferred by the permit, and it can 'only be enjoyed in common with the use of the avenue by the pub-

lic as an ordinary highway, and without materially impairing its usefulness as such.' * * *

"With the rights of the appellant in this street crossing thus defined, they are in subordination to the use for street purposes, which includes use for a street railway. The right in held in common, is 'joint and mutual, not exclusive' * * * and the primary object of the street is for ordinary passage and travel, of which the public and individuals cannot rightfully be deprived. * * * "

These rights, however, are not available to the plaintiff unless he also has the right to use the road over the Alaska Railroad Terminal Reserve, leading from the said wharf over the railroad right-of-way to the City of Anchorage. Therefore the important question is: What right has the plaintiff acquired under which he can use this roadway?

■ Under the evidence, the use and construction of said road was commenced in July, 1915, at a time when the lands were in the Chugach National Forest and a short time prior to the time that the Alaska Railroad Terminal Reserve was created, on August 31, 1915. While these lands were part of the Forest Reserve, the law, Title 16, U.S.Code, Section 478, 16 U.S.C.A. § 478, applied: "Nothing in this chapter shall be construed as prohibiting the egress or ingress of actual settlers residing within the boundaries of national forests, or from crossing the same to and from their property or homes; and such wagon roads and other improvements may be constructed thereon as may be necessary to reach their homes and to utilize their property under such rules and regulations as may be prescribed by the Secretary of Agriculture. * * * "

As the above originally passed, C. 2, Sec. 1, 30 Stat. 36, it provided that the rules should be prescribed by the Secretary of the Interior. On April 4, 1900, XXX Decision of the Department of the Interior, page 23, the Secretary of the Interior promulgated rules and regulations under the above statute which contain the following: "9. Pri-

vate wagon roads and county roads may be constructed over the public lands in the reserves wherever they may be found necessary or useful, but no rights shall be acquired in said roads running over the public lands as against the United States." It is apparent, that under such regulations no permanent right can be acquired against the United States, as distinguished from a mere license to use. Therefore, no right was acquired, that the plaintiff can now rely upon, before the establishment of the Alaska Railroad Terminal Reserve.

██ It is admitted by both sides that the statute of limitations and adverse possession do not run against the Government and that adverse possession does not result in any right in favor of the individual or the public holding such possession against the Government. Redfield v. Parks, 132 U.S. 239, 10 S.Ct. 83, 33 L.Ed. 327; Sparks v. Pierce, 115 U.S. 408, 6 S.Ct. 102, 29 L.Ed. 428; Simmons v. Ogle, 105 U.S. 271, 26 L.Ed. 1087; Palmer v. Low, 98 U.S. 1, 25 L.Ed. 60; Morrow v. Whitney, 95 U.S. 551, 24 L. Ed. 456; Oaksmith v. Johnston, 92 U.S. 343, 23 L.Ed. 682; Hedrick v. Hughes, 15 Wall. 123, 21 L.Ed. 52; Gibson v. Chouteau, 13 Wall. 92, 20 L.Ed. 534; Frisbie v. Whitney, 9 Wall. 187, 19 L.Ed. 668; Jourdan v. Barrett, 4 How. 169, 11 L.Ed. 924; Lindsey v. Miller, 6 Pet. 666, 8 L.Ed. 538; Buford v. Houtz, 133 U.S. 320, 10 S.Ct. 305, 33 L.Ed. 618; Omaha & Grant Smelting & Refining Co. et al. v. Tabor, 13 Colo. 41, 21 P. 925, 5 L.R.A. 236, 16 Am.St.Rep. 185. It is doubtful whether, even if adverse possession gave a right against the Government, the plaintiff in the case has made out a case, for the reason that the plaintiff contends, and the evidence supports his contention, that the use was permissive. Possession cannot be permissive and adverse at the same time. It is therefore apparent that the plaintiff has not acquired any right by adverse possession to the use of said road.

██ However, the plaintiff contends that since the use was permissive, and the City of Anchorage has expended

considerable money in the construction of the dock and the road in question and that because the Government does not hold these lands in a Governmental capacity, but in the capacity of a railroad operator, that it should be estopped and the plaintiff cites considerable authority in which municipal corporations, and in some cases, states and the Federal Government have been held estopped from enforcing a right that they would but for their conduct have been able to enforce. Applying the doctrine of estoppel to the case under consideration, without deciding that it legally applies, and without deciding that persons in charge of the Alaska Railroad in Alaska have authority to bind the Government by their conduct in a matter relating to real estate, the Court is of the opinion that since the wharf was built for and the use of the wharf and roadway has been almost exclusively confined to use by the Mosquito Fleet, that is, small boats plying on Cook Inlet, the Government would not now be estopped from preventing a different use than the one it had consented to or permitted.

This is not a case between the City of Anchorage and the Alaska Railroad in which the Alaska Railroad seeks to appropriate the improvements made by the City. Under the evidence, the defendants do not object to the use of the City Dock as it has been heretofore used, but object to any use of the City Dock that diverts the traffic which ordinarily comes to docks operated by the Alaska Railroad and thus deprives the Alaska Railroad of its wharfage. While it is undoubtedly true that the railroad is not allowed to charge for facilities that do not belong to it, nevertheless, that does not prevent the owner of the wharves who is also the owner of other uplands from preventing the use of these other uplands unless the equivalent of the wharfage charge is paid to it.

10 R.C.L. § 19, pp. 689, 690: It has been said that it is difficult to define equitable estoppel, that the cases themselves must be looked to and applied by way of analogy rather than a rule and that the following sums up the cases:

"That a person is held to a representation made or a position assumed where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has in good faith relied thereon. * * * That the acts, claims or conduct relied on to estop must be plainly inconsistent with the right afterwards set up."

It follows that the tacit permission given the City and the public to build and use the dock and roadway for a certain use does not estop the Government when a different use is being made of its property, even if it has permitted such use occasionally. The temporary order should be set aside and a permanent injunction refused.

The defendants may present findings of fact, conclusions of law and a decree in accordance herewith.